**Mrs. Brent Quinton DOWNS for herself as Executrix of the Estate of Brent Quinton Downs, and as guardian and next friend of Andrew Arthur Downs and Brent Q. Downs, II, minors,[1] et al.**

v.

**UNITED STATES of America.**

**Civ. A. No. 6642.**

United States District Court,
M. D. Tennessee,
Nashville Division.

April 8, 1974.

---

1. During the trial of this case counsel for Mrs. Downs moved to amend the style of her complaint so as to reflect her capacity as surviving widow of Brent Downs. If and to the extent the proposed amendment is necessary to qualify Mrs. Downs as a proper party plaintiff under Florida law, it is hereby granted. See discussion under Wrongful Death Claimants.

Gilbert S. Merritt, Jr., Thomas Wardlaw Steele, Jack A. Butler, Fred Thompson, Nashville, Tenn., for plaintiffs.

Charles H. Anderson, U. S. Atty., Martha A. Johnson, Asst. U. S. Atty., Nashville, Tenn., Neil R. Peterson, Trial Atty., Torts Sec., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

MORTON, District Judge.

This is a suit against the United States under the Federal Tort Claims Act[2] arising out of an incident of air piracy which occurred on October 4, 1971. The hijacker commandeered a chartered twin-engined aircraft in Nashville, Tennessee, and holding his estranged wife, a male associate, and two pilots hostage, proceeded towards the Bahamas. The aircraft landed for fuel in Jacksonville, Florida, and was confronted by waiting agents of the Federal Bureau of Investigation. The agents refused the hijacker's demands for fuel and ultimately disabled the aircraft by gunfire to prevent its departure. His plans frustrated, the hijacker took his own life, but not before killing his wife and the pilot. Charging negligence in the manner of FBI intervention, the pilot's wife, hijacker's daughter, and aircraft owner seek damages for wrongful death and injury to the aircraft.

This case poses the important question of whether this tragic event of October 4, 1971, can provide the basis for a damage suit against the United States under the Tort Claims Act. For reasons hereinafter developed, the court holds it can, but that plaintiffs are not entitled to the relief sought.

## FACTS

### I

During the mid-afternoon of October 3, 1971, George Giffe, Jr. called the office of Big Brother Aircraft, Inc. (hereafter "BBAI") at Nashville Metropolitan Airport and inquired about chartering a flight to Atlanta, Georgia, later that evening. He received a price quotation for the proposed trip, but made no commitment. At approximately 5:00 p.m. that day, Giffe visited BBAI's office and restated his interest in the charter, telling BBAI employees that he needed to leave Nashville around 1:00 a.m. the following morning with a business associate, drop him off in Atlanta, and pick up another passenger for the return trip to Nashville. While at the office, Giffe discussed his plans over the telephone with Randall Crump, the eventual co-pilot on the trip, and agreed to charter a Hawk Commander Aircraft[3] numbered N9058N (hereafter "58 November") for $417. Giffe paid a $200 deposit with two $100 bills and left, but made three additional visits to the BBAI hangar before arriving for departure shortly after 1:30 a.m. on October 4.

During these subsequent trips, Giffe placed three pieces of luggage aboard the chartered aircraft—a small metal box, a black attache case, and a suit bag. In addition, he paid the balance due on the charter of $217, again utilizing $100 bills, asked about the aircraft's range and baggage capacity, and sought to insure that the airplane would be ready for a 1:00 a.m. departure.

After being notified that 58 November had been chartered for the flight to Atlanta, Randall Crump called fellow BBAI pilot Brent Downs and informed him of the charter scheduled for early the next morning. Crump was not pilot-in-command rated on the Hawk Commander and would therefore serve as co-pilot to Downs, who was a regular first pilot on this aircraft.[4] The two pilots arrived at the airport by midnight and completed their preparations for the flight. An IFR (instrument flight rules) flight plan was filed for the round trip to Atlanta and back to Nash-

---

2. 28 U.S.C. §§ 1346(b), 2671–2680.

3. A twin-engine prop jet with seating for six to eight persons, including the pilots.

4. The first pilot, or pilot-in-command, has the ultimate authority and responsibility for the conduct of a flight.

ville, and Downs issued fuel instructions to BBAI linemen.

At approximately 1:00 a.m. Giffe drove his late-model Cadillac to a Nashville hotel and picked up his wife, who was just getting off work as cashier in the hotel dining room. With him was a short-time acquaintance, Bobby Wayne Wallace, whom Giffe had solicited to accompany the couple to the airport and drive Giffe's car back to town after they departed on a flight to Atlanta. Susan Lakich Giffe was separated from her husband, as she had been several times before in their often tempestuous marriage, and knew nothing about the upcoming flight. When told of the trip while en route to the airport she protested vigorously and demanded that she be taken home. But Giffe had other plans, and, if all went according to schedule, both he and his wife would be dead in the very near future.[5]

The three reached BBAI a little after 1:30 a.m., and Giffe parked his car a short distance behind the chartered aircraft. Leaving his two passengers in the front seat, he got out and walked to where Downs and Crump were standing. As he approached the pilots, Mrs. Giffe began screaming and was attempting to get out of the car. Giffe, claiming to be a physician, told the pilots that the girl was a patient being transported to Atlanta for hospitalization. Crump expressed concern over flying the woman in her hysterical condition, and told Downs that the flight should wait until the police could check out the situation.

Hearing this, Giffe pulled a gun and ordered the pilots, his wife, and Wallace to board the plane. All did so, and by this time Wallace was also holding a pistol. After a brief struggle between them, Giffe and his wife took seats in the rear of the aircraft, and Wallace took up a position directly behind the pilots.

With Downs occupying the left [6] front seat as first pilot and Crump the right as co-pilot, the aircraft taxied away from BBAI after receiving the flight plan and taxi clearances from airport ground control. While the aircraft taxied towards Runway 31, a BBAI employee who had witnessed the prior events rushed to a telephone and alerted the airport security police dispatcher to the situation. The control tower was notified and told to hold takeoff clearance, and two vehicles carrying security police were dispatched to intercept the aircraft prior to takeoff. As the vehicles converged on the aircraft at the approach end of Runway 31, Giffe ordered the pilots to make an immediate takeoff. Downs complied and, at 1:59 a.m. CDT, 58 November began its ill-fated journey. Once airborne, ground control instructed the pilot to "squawk" the hijack code,[7] and to contact Memphis Center [8] on an assigned radio frequency.

The aircraft climbed to and leveled off at 13,000 feet, the cruising altitude specified in the IFR clearance, and headed towards Atlanta. The seating arrangement remained the same, with Giffe in the right rear seat, his wife in the left rear, and Wallace stationed generally be-

---

5. Suicide notes found in Giffe's car later that day indicated his intent to kill himself and his wife.

6. In this and subsequent references, "left" and "right" are as viewed from behind the aircraft looking forward.

7. This refers to a specified sequence of numbers which may be set in an aircraft's transponder, an electrical device which facilitates radar tracking of aircraft by Federal Aviation Administration air traffic controllers. An aircraft's image as it appears on a controller's radar scope corresponds to the setting, or code, set in the aircraft's transponder. Certain designated codes enable a pilot to elec-

tronically communicate to controllers the existence of an abnormal flight condition, such as a hijacking or other emergency, when voice communication is not possible. The hijack code is one of the pilot initiated signals subject to the protective order in this case.

8. One of the several FAA regional Air Route Traffic Control Centers. Ground controllers in each center, utilizing radar and aircraft flight plans, coordinate the orderly flow and spacing of aircraft flying within the center's air space. Nashville is located within the geographical boundaries of Memphis Center, and during its flight 58 November also passed through the Atlanta and Jacksonville Centers.

hind the co-pilot but close enough to observe the pilots' actions and to hear comments between them and radio transmissions to ground stations. The pilots did not utilize headsets to receive incoming radio transmissions, which meant that radio communications to the aircraft were broadcast through cabin speakers and were thus monitorable by all aboard.[9] Ground controllers never requested that headsets be used, nor is there any direct evidence that Giffe or Wallace demanded they not be. However, Crump has indicated that Giffe wanted to hear what the pilots said to one another and presumably what was being said during radio communications.

Giffe apparently had very little direct contact with the pilots, but employed Wallace to relay messages back and forth. Before departing Nashville Giffe informed his audience that he had brought on board 12½ pounds of plastic explosives fused with a timing device which required resetting every ten minutes or so to prevent detonation. In referring to the threat of explosion, Giffe pointed to the small metal box which he had placed on the aircraft during one of his visits to the airport several hours before departure. According to Crump, Giffe declared that he was a member of the CIA with orders to carry out and he would destroy the aircraft should anyone attempt to interfere. Wallace apparently spoke rather casually with the pilots during much of the flight about matters other than the hijacking, and placed his pistol in the small of his back between his body and trousers. Giffe, on the other hand, apparently held his gun during most of the trip and also held in his lap the metal box which ostensibly contained the plastic explosives. The men had drunk a few beers together earlier in the evening, and during the flight Wallace drank one more while Giffe consumed a quantity of some other alcoholic beverage he found on the aircraft.

A short while after takeoff, Downs and Crump began to ask whether Atlanta was to be the actual destination. Following one such inquiry, Wallace discussed the matter with Giffe and then asked the pilots what the aircraft's range was with the fuel remaining. When told that sufficient fuel was available for the trip to Atlanta and back to Nashville, Wallace then asked whether the aircraft could make it to Jacksonville, Florida. Crump checked the mileage from the aircraft's position near Chattanooga, Tennessee, and advised Wallace that the aircraft could make Jacksonville, but would have only about thirty minutes fuel remaining upon arrival.[10] Following further discussion with Giffe, Wallace told the pilots to fly towards Jacksonville. Jacksonville weather and clearance to the new destination were received from Atlanta Center, and the aircraft altered course, climbing to a higher en route altitude of 17,000 feet.

It was not until the aircraft was in the vicinity of Atlanta that either Wallace or Giffe expressed any concern over the possibility that ground controllers might be aware that 58 November was being hijacked. At this point, however, Wallace asked the pilots if the persons to whom they were communicating knew the situation, and Downs reportedly replied that they did and had known ever since the aircraft left Nashville. Further, Downs said that "someone" would be waiting for them at Jacksonville or wherever they landed. This statement prompted further discussion in the rear of the aircraft, and Wallace then inquired about Jamaica as an alternate destination. Downs indicated that the aircraft could not reach Jamaica, but that by refueling at Jacksonville the

9. Headsets, when connected into the communication system, deactivated the cabin speakers. Being more comfortable without headsets on, the customary practice of BBAI pilots on this aircraft was to use the cabin speaker system.

10. In reality, the aircraft should have had approximately 90 minutes fuel reserve at Jacksonville, and as related by Crump in his testimony in this case, both he and Downs were aware of this fact at the time.

plane could reach Freeport, Bahamas.[11] In addition to fuel, Giffe was informed that navigation charts and flotation gear would be needed for the overwater flight to Freeport, and that Downs could request these items be made available upon landing. Giffe apparently concluded that a stop in Jacksonville was necessary, and the following conversation took place between the pilots (P) and Jacksonville Center (ATC): [12]

P: Jax Center, 58 November.
ATC: 58 November, go ahead.

P: All right, sir; we've got kind of unusual situation here, uh-uh, we're going to need some fuel at Jackson and, uh, we can't have anybody around except the fuel truck and the man fueling. Uh, nobody else in the area. We will need flotation gear and, uh, if there's any way possible I need some charts and approach plates for Freeport. Yeah, we need jet fuel. And if you can't, wish you could work out some kind of flight plan—vestor us to Freeport, and we need to make sure that there is nobody, and I emphasize that, nobody around the airplane except the fuel truck and the attendant.

ATC: 58 November, Jacksonville copied it all, copied it all.

P: All right. We need flotation gear. This is a, uh, this is an eight place airplane. Just make flotation gear for that will be sufficient.

ATC: 58 November. Wilco. Wilco.[13]

P: Call me back on that if you can and let me know if there is going to be any delays at all in the fuel truck waiting on us when we get there.

ATC: 58 November. Everything will be ready. Everything will be ready as specified.

P: All right and, uh, all right, they say to clear the area for at least 200–300 yards around the airplane and make sure there is nobody around it.

ATC: 58 November. Copied. Copied.

P: Thank you, sir.

P: Center, have another unusual request. Uh, two bottles of Scotch.

ATC: 58 November. Understand.

P: Chevas 12 if you can get it. And also on that routing I would prefer to stay over land as much as possible until we make the direct entry to Freeport there and if you could give me the mileage since I don't have the charts I would appreciate that so I can kind of figure some fuel here.

ATC: 58 November. Will work on that and advise.

\* \* \* \* \* \*

P: Center, 58 November. We'd like an APU [auxilliary power unit] for a restart after we get there at Jacksonville.

ATC: 58 November. Copy, APU.

P: Roger.

Soon after these requests were made and acknowledged, at approximately 4:45 a. m. EDT on October 4, 58 November began a descent for landing at Jacksonville. A few minutes later Jacksonville Center handed off radar control of the aircraft to Jacksonville Approach Control. After approach control issued heading instructions, the following remarks were exchanged with the pilot:

P: 58 November. Roger. Has our request been complied with?

T: We're checking on it for you right now, sir. We've been ad-

11. Crump has indicated both pilots felt Freeport might have been reached without refueling, but that the fuel supply upon arrival would have been critically low. Giffe was not told this for fear he might decide to risk reaching Freeport nonstop.

12. All radio communications quoted herein are from FAA tape recordings which were transcribed by plaintiffs and introduced into evidence.

13. Contraction meaning "will comply."

vised by Aircraft Services that they're trying to, attempting to get your request completed.

P: Thank you.

\* \* \* \* \* \*

P: One three O, 58 November. Y'all going to maintain clearance around the plane about 200–300 yards?

T: That information has been forwarded.

P: Roger.

The aircraft continued its descent and approach, and at approximately 5:05 a. m. EDT touched down on Runway 7 at Jacksonville International Airport. After landing, the tower issued taxi instructions directing the aircraft to a vacant parking pad adjacent to Air Kaman, Inc., a fixed base operator [14] at the airport. While taxiing, the following conversation took place:

P: Is the fuel truck here?

T: You say is it a fuel truck?

P: I say is the fuel truck here?

T: Affirmative.

\* \* \* \* \* \*

P: OK. We're going to turn it around and head it back out.

T: You want to park right there, 58 November, for fueling?

P: That'd be fine.

T: OK. That's fine. Right there. Park right where you're at.

P: 58 November. They are going to keep this area clear. Is that correct.

T: That's affirmative.

As these transmissions were being made, 58 November had reached the designated parking area, made a 180-degree turn, and came to a stop, engines running, pointed down the taxiway just traveled. Looking outside, the airplane's occupants saw an automobile parked nearby.

## II

Special Agent Roger A. Myers of the Nashville office of the FBI became that agency's first employee to learn of the hijacking when, at approximately 2:15 a. m. CDT on October 4, he was awakened at his home by a telephone call from Willis Walker, a security officer at Nashville Metropolitan Airport. Myers was informed that a few minutes earlier two men armed with guns had forced a female companion and two pilots onto a BBAI Hawk Commander aircraft and taken off for an unknown destination. In rapid sequence Agent Myers made numerous telephone calls to persons possessing pertinent information about the event, and by shortly after 2:30 a. m. CDT had transmitted the known facts to FBI regional headquarters in Memphis, Tennessee.[15] In addition to the information he had received from Walker, Myers was able to tell Memphis personnel that one of the hijackers' names was George Giffe and that the flight was en route to Atlanta, Georgia. Memphis agents were soon advised that 58 November was en route to Jacksonville, Florida, and, according to a clerk in the Memphis office, available information was telephonically communicated to the FBI's night duty agent in Jacksonville at approximately 3:05 a. m. CDT.[16] At that time 58 November was one hour away from its 5:05 a. m. EDT landing in Jacksonville.

The person handling communications that morning in Jacksonville was Special Agent Russell J. Pardee. His initial notification of the hijacking came in a

---

14. A fixed base operator sells aircraft fuel and oil, and depending upon its size, may offer various other services such as aircraft storage, parts and maintenance, eating facilities, and flight-planning materials.

15. By this time, the Washington, D. C. offices of both the FAA and the FBI were aware that the hijacking was in progress. At no time, however, did FBI headquarters assume direct command or supervision over FBI activities.

16. According to the Jacksonville night duty agent, however, the first call from Memphis was not received until approximately 5:10 a. m. EDT or 4:10 a. m. CDT.

3:55 a. m. EDT call from Carroll Bright, an FAA control tower supervisor at Jacksonville International Airport. Bright related that a twin-engine Hawk Commander aircraft carrying two men and a woman had been hijacked at gunpoint in Nashville, Tennessee, was expected to land at Jacksonville at 5:00 a. m. EDT, and after landing would be directed to the Air Kaman ramp. Pardee immediately called James J. O'Connor, Assistant Special Agent in charge of the Jacksonville FBI office, and relayed this information. O'Connor instructed Pardee to alert Special Agents Francis Burns, Dalton Mayo, James McBride, John Saalfield, and George Murphy, and have them meet him at the airport as soon as possible. By 4:30 a. m. EDT these five FBI agents were converging upon Jacksonville International Airport; except for Burns, it was to be each agent's first response to an act of air piracy.

O'Connor was the first to reach the airport when he arrived at Air Kaman in his personal automobile at approximately 4:50 a. m. EDT. He checked in with Pardee by telephone, and was advised that 58 November's pilot wanted fuel upon landing, and a clearance of 200–300 yards maintained around the aircraft. The pilot had also requested overwater gear for eight people, navigation charts to Freeport, and two bottles of Chevas Regal scotch.

By 5:00 a. m. Agents Burns and Murphy had arrived at the airport control tower in an FBI automobile. Leaving Burns in the tower to coordinate radio communications, Murphy drove to meet O'Connor as 58 November was making its final approach to Runway 7. Murphy met O'Connor at Air Kaman, and the two agents parked their Bureau vehicle, headlights out, just off the southeastern corner of the Air Kaman ramp and faced the hijacked aircraft which was now being taxied towards them.

From their homes Agents McBride and Mayo proceeded first to the FBI office and secured a radio-equipped automobile and a telescoped .308 rifle.

Their arrival at the airport coincided with that of 58 November and, upon directions from Burns in the tower, they made their way towards Air Kaman and parked behind a group of fuel trucks some 200 yards to the northeast, or right-front of 58 November which had just come to a stop on the ramp facing north. It was now approximately 5:15 a. m. EDT.

### III

Following his initial transmission of data to FBI agents in Memphis at 2:30 a. m. CDT, Agent Roger Myers continued his efforts in Nashville to gather information pertinent to the hijacking. His most valuable sources of information during this period were Major and Mrs. Joseph Lakich, parents of the hijacker's wife. They had known George Giffe for several years, and during the course of telephone conversations on the morning of October 4, Myers learned from the Lakiches that Giffe frequently carried a pistol, and had spoken at times of an association with the mafia; that Giffe and their daughter had a long history of marital difficulty; and that Giffe had told Mrs. Lakich the preceding day he planned to leave the country. In their opinion, Giffe was a psychopathic liar and neurotic, and coupled with an expressed concern for the safety of their daughter was the advice that the FBI should use caution in handling Giffe. After speaking with the Lakiches, Myers called the Memphis FBI office again at approximately 3:45 a. m. CDT, and related the substance of his conversations to Agent Thomas Isely.

For unknown reasons, these revealing observations about George Giffe never reached O'Connor at the Jacksonville International Airport. Isely testified that he telephoned Myers' message to the Jacksonville FBI office at approximately 4:00 a. m. CDT. Pardee, on the other hand, has stated that the call he received from Memphis at approximately 5:00 a. m. EDT included only such information as a brief description of the two armed hijackers and their female hostage, that

one of the hijacker's names was "Giffe," and that the woman dragged aboard the aircraft in Nashville was Giffe's wife with whom he had been having marital difficulty.[17] This was the information which Pardee radioed to O'Connor shortly after 5:00 a. m. EDT, and thus O'Connor was somehow deprived of a potentially valuable insight into the man he was about to confront.

## IV

It was probably O'Connor and Murphy who the occupants of 58 November spotted as the aircraft taxied to a halt on the Air Kaman ramp.

P: . . . What's the car sitting back off to our right?

T: It's just an airport vehicle as far as I know, sir.

P: Does he have a radio in it?

T: Say again, 58 November.

P: Can you have it moved away from over there, maybe have Air Kaman find someone.

T: 58 November?

P: Yes.

T: 58 November. This is the FBI speaking. Cut your engines.

With this statement from Agent Burns in the tower, the FBI assumed command of the hijacking at approximately 5:15 a. m. EDT. Burns was the only agent in direct radio communication with the hijacked aircraft; through a separate radio hookup he relayed messages to and received instructions from O'Connor. As 58 November taxied towards Air Kaman, O'Connor radioed Burns that the pilot's requests for fuel and other items would not be granted. To his other agents, O'Connor remarked that this would be a "waiting game." Burns relayed the fuel decision to the

aircraft in the course of the following conversation:

P: 58 November. This is the captain speaking. We're going to cut the engines and we're gonna need some fuel but I request that everyone stay away.

T: 58 November. Advise when your engines have been cut.

T: 58 November?

P: This is 58 November. Uh, this gentleman has about 12.5 pounds of plastic explosives back here, and (pause) uh, I got no (pause) uh, yen to join it right now so I would please expr, uh, appreciate it if you would stay away from this airplane.

T: That's a roger, 58 November. Are your engines cut?

P: Negative.

T: Standby.

P: Where's the fuel truck?

T: 58 November?

P: 58 November. Go ahead.

T: This is the FBI. There will be no fuel. Repeat. There will be no fuel. There will be no starter. Have you cut your engines?

P: Uh, look, I don't think this fellow's kiddin'—I wish you'd get the fuel truck out here.

T: 58 November. There will be no fuel. I repeat. There will be no fuel.

P: This is 58 November. You are endangering lives by doing this, and uh, we have no other choice but to go along, and uh, uh, for the sake of some lives we request some fuel out here, please.

T: 58 November. What is the status of your passengers?

17. Pardee contends that this 5:00 a. m. EDT call, which he remembers as being from a clerk named Steve Jenkins, was the first communication received from the Memphis office on October 4. Jenkins claims not to have made this call, but the one allegedly made approximately one hour earlier at 4:05 a. m. EDT. It is interesting to note that knowledge of the Giffes' marital problems, which Pardee does recall being told in the 5:00 a. m. EDT call, was not known at the time of Jenkins' alleged call, and was a portion of the information which Isely claims to have forwarded to Jacksonville.

P: Ah, uh, well, they're okay, if that's what you mean.

T: Are they monitoring this conversation?

P: Yes, they are.

T: Do you have two passengers aboard?

T: 58 November. What's your present fuel status on that aircraft?

P: We're down to about thirty minutes.

T: 58 November. The decision will be no fuel for that aircraft. No starter. Run it out, any way you want it. Passengers, if you are listening—the only alternative in this aircraft is to depart the aircraft, to depart the aircraft.

Crump recalls that Giffe, upon hearing that refueling would not be permitted, said "Let's get out of here," or made a statement to that effect. The pilots made no attempt to comply with this instruction, and one or the other told Giffe that the aircraft could not take off from its position on the ramp, and that at any rate the plane would be unable to go anywhere with only 30 minutes of fuel remaining.[18] A few moments later Crump requested that he be allowed off the aircraft to negotiate for fuel. Giffe assented, and the left engine was shut down to permit a safe deplaning. As the co-pilot was preparing to depart, the hijacker, belying a new and strangely quiescent mood, pointed to the metal box in his lap and said, "I'll blow the airplane up." Crump then exited 58 November shortly before 5:25 a. m. In the tower, Burns observed Crump's departure.

T: 58 November?

P: Yeah.

T: Did someone deplane from your aircraft?

P: That's affirmative. The copilot.

Crump proceeded to the rear of the aircraft and was met immediately by O'Connor and Murphy. He identified himself as the co-pilot, and after a brief exchange of remarks was placed in Murphy's car. There is some dispute as to what information was supplied by or elicited from Crump during this conversation. He remembers saying or being asked very little about the situation inside the aircraft, and his principal recollection was of being told by O'Connor that the existence of explosives aboard the aircraft was a "bunch of malarky." O'Connor, on the other hand, relates that Crump told him there had been drinking aboard the aircraft, the woman had been hysterical but was now quiet, both hijackers were armed, and he feared Giffe would force Downs to take off due to the delay. In any event, the court finds that O'Connor did not attempt to solicit information descriptive of the mental state of Giffe or his supposed accomplice. Crump was told he could not return to the aircraft,[19] and Burns relayed this decision.

T: 58 November?

P: [inaudible reply]

T: The copilot is in the car and will not return to the aircraft. He will not return to the aircraft.

According to Wallace, Giffe became excited upon hearing this transmission, and again made the statement that if they didn't get fuel he would blow up the aircraft. Wallace then suggested that he get off to see about getting fuel, and after an initial refusal, Giffe consented. It was a minute or two before 5:30 a. m. EDT when Wallace left the plane and walked toward O'Connor and Murphy. He was quickly disarmed, arrested for air piracy, and placed spread-eagled on the ground behind the

18. Again, both pilots knew that approximately 90 minutes of fuel remained. A post-incident investigation revealed that, under normal flight conditions, 94 minutes of flying time would have been possible with the fuel remaining at Jacksonville, and that a safe flight to Freeport would not have been possible without refueling.

19. Crump has stated that he had no intention of reboarding the airplane anyway.

aircraft.[20] In accordance with customary procedures, O'Connor had little or no discussion with Wallace subsequent to his arrest, but Wallace did apparently manage to say that he had come out to negotiate for fuel and that Giffe had been drinking, was upset, and appeared desperate.[21]

At this point, which would have been approximately 5:30 a. m. EDT, or some 15 minutes after 58 November reached Air Kaman, O'Connor decided that the aircraft would be disabled to prevent departure. First, leaving Murphy with Wallace, he walked back to his car and radioed Agents Mayo and McBride to position their automobile directly in front of the aircraft so as to block its avenue of escape down the taxiway. Following this transmission, he returned to Wallace and instructed Murphy to move up and shoot the aircraft's right tire. Murphy walked up to within ten feet of the right landing gear, fired two bullets into the tire, and came back to where O'Connor stood guard over Wallace.

After their initial stop behind the gasoline trucks, Mayo and McBride moved their car west of the trucks to an improved vantage point approximately 400 feet from the aircraft. Mayo remained in the car to receive radio communications and McBride got out and moved several feet away to view the aircraft through his rifle scope. He heard O'Connor's blocking instruction and, as he ran back to the car, heard what sounded like two "muffled" shots. The two agents drove quickly around to the Air Kaman taxiway and stopped, headlights on bright, at a point about 50 feet in front of and facing the aircraft. As they arrived, O'Connor was approaching the aircraft from the rear; the left engine was stopped but the right was still running and making considerable noise. McBride hurried to a position approximately 25 feet away from the left side of the forward section of the fuselage to provide coverage for O'Connor, who by now was making his way along the right side of the aircraft towards the cockpit. As he surveyed the scene, McBride observed the pilot, wearing a headset,[22] sitting almost motionless except for a slow turning of his head towards the left and then back to the front.[23]

Mayo took up a station to the right and front of the aircraft, slightly forward of the cockpit, and saw O'Connor appear to take a quick look in the right cockpit window, and then proceed in a crouched position around the nose of the aircraft shouting out his identity and instructing the occupants to come out. As he rounded the nose O'Connor heard two shots ring out from within the aircraft as bullets pierced the windshield above his head. As O'Connor continued on towards the door of the aircraft, McBride heard three to four more shots and simultaneously saw the pilot slump over to his right and out of view. Curiously, O'Connor did not hear this next sequence of shots from his position adjacent to the door, and he proceeded to take his revolver and fire two rounds into the aircraft's left tire.

O'Connor then returned to the right side of the aircraft and was met by McBride. Acting on O'Connor's instructions, McBride fired two rounds from his rifle into the forward section of the right engine. O'Connor explained that he wanted the engine silenced to permit communication with the hijacker and, more importantly perhaps, to further in-

---

20. In his subsequent criminal trial, Wallace was acquitted of any criminal involvement in this incident.

21. Like Crump, Wallace also did not want to return to the airplane.

22. This is the only indication in the record that either pilot wore a headset during the entire flight.

23. On the bases of the "muffled" shots purportedly heard by McBride and what is characterized as an unnatural absence of movement in Downs at this point, the Government contends that Giffe shot Downs before the first FBI shot was fired by Murphy. This contention, which goes to the issue of proximate causation, is considered briefly in the discussion of negligence, *infra*.

sure that the aircraft could not be moved, since he had observed no deflation in either tire which had been shot. Spewing fuel, the engine stopped running and O'Connor walked back to the left side of the aircraft, again shouting his identity and ordering the occupants out. As he approached the door he heard a groaning sound, and looking inside saw that the pilot and woman passenger were apparently dead and the hijacker alive, but mortally wounded. At approximately 5:34 a. m. EDT, or some 19 minutes after the FBI assumed control of the incident, the flight of 58 November was over.

## THEORIES OF RECOVERY— DEFENSES

Plaintiffs Mrs. Brent Quinton Downs, widow of Brent Quinton Downs, and Major and Mrs. Joseph S. Lakich, as legal guardians and adoptive parents of Susan Germaine Lakich, minor child of Susan Germaine Giffe, deceased, sue the United States to recover for the wrongful deaths of their respective decedents. Each action is founded upon allegations of negligent conduct by government employees during this incident of hijacking, with particular emphasis being placed on the decisions and actions of Agent James O'Connor. Plaintiff BBAI, a Tennessee corporation engaged in the business of fixed base operations and the owner of 58 November on October 4, 1971, sues the Government on a theory of trespass to chattels for damages resulting from the shooting of the hijacked aircraft by FBI agents.

The Government interposes numerous defenses to plaintiffs' claims. Principal among these is the assertion that the allegedly wrongful acts occurred during the performance of a discretionary function and are therefore exempted from Tort Claims Act coverage by 28 U.S.C. § 2680(a). In conjunction with this defense, the Government argues that the

individual FBI agents would be immune from personal liability in this case, and the United States is therefore likewise immune under the Act's doctrine of respondeat superior. Other defenses raised by defendant are that plaintiffs Downs and Lakich failed to file proper administrative claims prior to instituting this action; that these plaintiffs are improper claimants under the Florida Wrongful Death Act; [24] that the FBI agents were not guilty of negligence; and that at least a portion of the BBAI claim is precluded by the interference with contract rights exemption of 28 U.S.C. § 2680(h).

In addition to the above, the Government contests the measure of damages claimed by plaintiffs as allowable under the Florida Wrongful Death Act. In the event of liability, the Government has filed third party complaints which seek indemnity and/or contribution from plaintiffs Downs and BBAI on the basis of alleged contributorily negligent acts or omissions by the deceased pilot and other BBAI officers and employees.

The Tort Claims Act renders the United States liable for its employees' torts "in accordance with the law of the place where the act or ommission occurred." 28 U.S.C. § 1346(b); *see generally,* Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). The rights of the parties are therefore to be determined in reference to the law of Florida, the place where both the allegedly wrongful acts and their operative effects took place.

As previously adverted to, the court shall find that plaintiffs have failed to establish negligence or actionable trespass on the part of the United States through its employees. Nevertheless, in order to achieve a complete resolution of all issues presented and for the sake of judicial economy, the court has included in this opinion its findings on the issue of damages.

24. Fla.Stat.Ann. § 768.01 et seq. (1964). (Now Fla.Stat.Ann. §§ 768.16–768.27, as amended, 1972, Laws of Florida, Chapter 72–35.)

### ADMINISTRATIVE CLAIMS

The Government has moved to dismiss the Downs and Lakich cases on the ground that the administrative claims filed in these actions do not comply with the requirements of the Tort Claims Act. The Act, in 28 U.S.C. § 2675(a),[25] makes the filing of an administrative claim a prerequisite to maintaining a civil action against the United States. The claim must be filed and denied, either expressly or by failure of the Government to take action within six months, before suit may be commenced.

The regulations implementing the administrative claim requirement, 28 C.F. R. § 14.1, et seq., provide in pertinent part:

"§ 14.3 *Administrative claim; who may file.*

 \* \* \* \* \* \*

"(c) A claim based on death may be presented by the executor or administrator of the decedent's estate, or by any other person legally entitled to assert such a claim in accordance with applicable State law.

 \* \* \* \* \* \*

"(e) A claim presented by an agent or legal representative shall be presented in the name of the claimant, be signed by the agent or legal representative, show the title or legal capacity of the person signing, and be accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative."

Initially, the Government asserts noncompliance with subparagraph (e) of this requirement.

The claims were first presented to the involved federal agencies in letter form on October 15, 1971. This letter, signed by plaintiffs' attorneys, set forth the plaintiffs' names, a brief description of the acts upon which the claims were based, and the amount of damages sought in each of the three cases. By telegram and supporting letter, the Department of Justice notified plaintiffs' attorneys that the purported claims did not satisfy the requirements of 28 C.F. R. § 14.3(e) since they were not accompanied by evidence of the attorneys' authority to act in a representative capacity for the plaintiffs. Enclosed with the Government's letter were copies of Form SF–95, the standard claim form, for use in resubmission of plaintiffs' claims.

■ These forms were completed, signed by the individual claimants, and returned to the Government together with authorization from Mrs. Downs and the Lakiches for their attorneys to act for them in the case. Plaintiffs, through their attorneys, also specifically requested to be advised should the claims be found to be invalid for any other reason, but received no further communication from the Government. Considering these documents, the court finds that plaintiffs provided ample evidence of their representatives' authority to present claims on their behalf.

As a further defect in the Downs case, the Government apparently contends that Mrs. Downs' capacity, as set forth in her administrative claim, is not that in which she commenced suit or at least is not a capacity in which she is entitled to the relief sought under the Florida Wrongful Death Statute. This raises the question of what detail is required to fulfill the administrative claim requirement.

A principal purpose of this requirement, as reflected in the legislative history of the 1966 amendment, is to establish a means of efficiently settling meritorious accident claims without resort to expensive and time-consuming litigation. To effect this purpose the Government needs notification of an accident, the amount of damages sought to be recovered, and sufficient factual information to enable the appropriate federal agency to conduct an investigation to determine if the claim justifies settlement.[26]

---

25. As amended in 1966 by Pub.L. 89–506, § 2, 80 Stat. 306.

26. See, 1966 U.S.Code Cong. & Admin.News, p. 2515.

■ The plaintiffs' claims provided information sufficient to enable the Government to investigate the incident, weigh the merits of the claims, and to effect attempts at prelitigation settlement, if desired. So advised, it will not do for the Government to import into the administrative claim process a requirement that these claimants have anticipated and resolved in their claims every potential obstacle to a successful action under the Florida Wrongful Death Act.

The sufficiency of the administrative claims should also be viewed against the background of the Tort Claims Act itself. Given the remedial nature of the Act, there has been said to exist a "judicial unwillingness to permit the United States to stand on technicalities once a claim has been filed." Locke v. United States, 351 F.Supp. 185, 187 (D. Hawaii 1972). In essence, this is what the Government attempts to do here. The court finds no merit whatever in this defense, and holds that the administrative claim requirement has been satisfied in this case.

## WRONGFUL DEATH CLAIMANTS

Section 768.02 of the Florida Statutes, F.S.A., sets forth, in order of preference, the classifications of persons who possess the cause of action for another's wrongful death.

"Every such action shall be brought by and in the name of the widow or husband, as the case may be, and where there is neither widow nor husband surviving the deceased, then the minor child or children may maintain an action; and where there is neither widow nor husband, nor minor child or children, then the action may be maintained by any person or persons dependent on such person killed for a support; and where there is neither of the above classes of persons to sue, then the action may be maintained by the executor or administrator, as the case may be, of the person killed . . . . ."

■ The Florida courts have consistently held that the nonexistence of persons in a higher, or perferred, class is substantive to the plaintiff's cause of action. E. g., Love v. Hannah, 72 So.2d 39 (Fla.1954); Benoit v. Miami Beach Electric Co., 85 Fla. 395, 96 So. 158 (1923); Louisville & N. Ry. Co. v. Jones, 45 Fla. 407, 34 So. 246 (1903). The Government contends that neither Mrs. Downs nor Susan Lakich qualifies as the proper wrongful death claimant, and that consequently each of their actions must be dismissed.

### The Downs Case

Mrs. Downs instituted suit for herself as executrix of her husband's estate and as next friend of two minors, and the defect found by the Government is the existence of a higher category of claimant, namely, Mrs. Downs as widow. This defense would hardly seem to warrant comment were it not for the rather narrow construction traditionally given § 768.02 by Florida courts. Plaintiff denies that Mrs. Downs' suit would not be entertained in a Florida court as filed, but at any rate moved at trial to amend the complaint to reflect Mrs. Downs' capacity as widow. The Government, citing Rule 82, Fed.R.Civ.P., opposes the amendment, apparently on the basis that to allow such would alter the jurisdictional requirements of § 768.02 and thereby exceed the jurisdiction of this court.

Therefore, two questions are presented in reference to Mrs. Downs' capacity as the proper party plaintiff: Is her complaint sufficient under § 768.02 as filed? If not, would her requested amendment be granted under Florida law?

Initially, it seems likely that the defect found by the Government in the style of the case is thereafter cured in the description of parties section. As stated in Benoit v. Miami Beach Electric Co., supra, 96 So. at 159, " . . . the declaration, in order to show a cause of action, should affirmatively show the nonexistence of any other person having

a precedent right of action over the plaintiff . . . . " (Emphasis supplied.) This language clearly implies that a plaintiff's status as the preferred claimant need be alleged somewhere in the complaint or initial pleading, of which the style is only a part. Although Mrs. Downs is designated as "executrix" in the style of her complaint, the description of parties section denotes that she is the widow of Brent Downs. Thus, since her complaint, taken as a whole, does allege the nonexistence of any preferred class of plaintiff, it would appear that the requirements of § 768.02 have been met. In addition, ample proof of Mrs. Downs' status as widow was adduced during the course of trial. Nevertheless, even if this matter must be resolved in reference only to Mrs. Downs' designation in the style of her complaint, the court concludes that the alleged defect does not call for dismissal.

It is true that Florida courts have traditionally construed § 768.02 rather strictly. As might be expected, most of the decisions considering a challenge to the plaintiff's standing involved situations where there was in existence at the time of decedent's death a person other than the plaintiff with a preferred status under the wrongful death statute. For instance, a person claiming as one dependent upon the deceased for support would have no cause of action if the deceased died leaving a spouse. The reasons underlying the strict application of statutory priorities are obvious; the Florida courts have taken care to insure that the individual who recovers for another's wrongful death is that person the legislature intended to receive compensation.

The Downs situation is somewhat unique in that the person of preferred status under the statute is the one who brought suit, but styled as one of a subordinate class of claimants. Although it would seem logical to overlook the defect since in either event the person intended by the legislature to seek recovery is

doing so, the Government points out that Florida courts have been strict enough in their interpretation of § 768.02 to deny recovery in situations similar to the instant case.

Benoit v. Miami Beach Electric Co., *supra*, is such an example. There, the deceased's mother brought suit as administratrix of his estate. At the time of death her son was unmarried, had no children, and contributed a portion of his mother's support. Plaintiff's action was dismissed since as one dependent upon the deceased for support she occupied a preferred status above her capacity as administratrix. *Benoit* is similar to the situation in Downs in that the person of a preferred class under the statute whose nonexistence was not alleged was the same person who brought suit, but as one of a lesser priority. The case is the only one cited by the Government which carried the literal interpretation of § 768.02 to such an extreme, but the general philosophy is to be found in numerous other cases. *See,* e. g., Love v. Hannah, *supra;* Holland v. Hall, 145 So.2d 552 (Fla.App.1962).

Plaintiffs contend that more recent cases reflect a disposition of Florida courts to take a more liberal approach to the issue of proper claimants under § 768.02 in order to achieve the remedial purposes of the Wrongful Death Act. In 1972 the Florida legislature enacted a new wrongful death statute [27] under which Mrs. Downs' standing here would not be questioned, and plaintiff claims that the later, more liberal interpretations of § 768.02 by the Florida Supreme Court gave rise to the new statute and should control the instant case. Of principal significance in this regard are Garner v. Ward, 251 So.2d 252 (Fla.1971) and Powell v. Gessner, 231 So.2d 50 (Fla.App.1970).

The facts in *Garner* were as follows. Decedent had been married twice, and at the time of his death had children by his first marriage dependent upon him for support. His surviving spouse brought

27. F.S.A. §§ 768.16 and 768.17.

the wrongful death action, and his first wife sought to intervene individually and on behalf of the dependent minor children. The trial court denied intervention and the decision was upheld upon appeal. The Florida Supreme Court reversed, and allowed the divorced wife and dependent minor children to participate as plaintiffs together with the deceased's second wife. The court condemned the harsh results which had frequently been brought about by strict interpretations of § 768.02, and noted that " . . . the primary purpose [of the wrongful death statute] is to create a cause of action for wrongful death, and secondarily to specify who may bring the action to implement the greater purpose." Garner v. Ward, *supra*, 251 So.2d at 256. The court found it clear that the wrongful death action was designed to protect the family and dependents of an individual in event of wrongful death, and stated that the intent of a statute susceptible of more than one construction· controls over a strict interpretation which would defeat the statute's purpose or achieve absurd results. In the case before it, the *Garner* court then found that the legislature could not have intended that the deceased's minor dependent children, who would have benefited by their mother's recovery, should be deprived of their statutory rights merely because their mother and father were divorced.

In Powell v. Gessner, *supra*, the father of a deceased son, upon whom the father was dependent for support, was given preference in bringing a wrongful death action over the deceased's minor children who had been adopted by others prior to their father's death. The holding was a departure from traditional decisions since, under a strict interpretation of § 768.02, minor children of a deceased have a superior right of action over dependents, regardless of whether the children were adopted by others prior to the natural parent's death. The *Powell* court reasoned that the legislative history of § 768.02, reflected that a minor child's priority over one dependent for

support presupposes the existence of a normal parent-child relationship, not one in which the family relationship has been ruptured through adoption or divorce. Unlike the normal family relationship, an adopted child is not financially dependent upon its natural father following adoption, nor is the child then entitled to support from its natural father under Florida law. In such a case, the court found that a literal application of § 768.02 would deprive the decedent's parents, who were dependent upon him for financial support, of their cause of action—a result which the court found the legislature would not have intended had it envisioned the situation.

The Government argues that the liberal approach of *Garner* and *Powell* is inappropriate in the instant case since those decisions are restricted to situations in which the fundamental family relationships contemplated by the legislature have been destroyed through divorce and adoption. Evans v. Atlantic Cement Co., 272 So.2d 538 (Fla.App. 1973) is cited in support of this contention. *Evans* was itself a liberal interpretation of § 768.02, holding that a decedent's dependent children by a common law marriage could participate in a wrongful death action along with decedent's legal wife and children. However, the Government relies upon *Evans'* statement, referring to *Garner*, that "we believe the literal wording of the statute to be still applicable where fundamental family relationships still obtain." *Id.*, at 541.

■ Despite this purported restriction, the court concludes that, under the *Garner* rationale, the technical defect raised by the Government is not sufficient to warrant dismissal of the complaint in the Downs case. First, *Garner* makes it clear that the harshness of strictly applying § 768.02 ought to be avoided in cases where the obvious intent of the legislature would otherwise be frustrated. *Garner* sought to avoid absurd results, and to deprive Mrs. Downs of her cause of action in the instant case on the basis of the alleged de-

fect would be, in the court's opinion, absurd.

Secondly, since *Garner* went so far as to permit persons of a subordinate class of claimants to participate in a wrongful death action with other persons of a higher class, it seems reasonable to conclude that the *Garner* court, notwithstanding its immediate concern with disrupted family circumstances, would have permitted suit by a person of the highest statutory priority who inadvertently sued as one of a lesser class. This result would certainly require a less liberal approach to § 768.02 than that which the *Garner* court actually took, and it is not inconsistent with the *Evans* view that the literal wording of the statute is still applicable where fundamental family relationships still exist. *Evans* says no more than, except where family relationships have been disrupted in a way unforeseen by the legislature, courts will still apply the statute literally to insure that the cause of action vests in the proper statutory claimant. In other words, the continuing concern involves different persons in different classifications, not the same person in two separate categories. When it is obvious that the plaintiff is the preferred claimant for another's wrongful death, then technicalities should not provide an obstacle to pursuing the cause of action.

■ Accordingly, the court holds that the complaint in the Downs action complies with the requirements of the Florida Wrongful Death Act in respect to Mrs. Downs' right to maintain this action. However, even were this not so, the court further finds that plaintiff's motion to amend the complaint so as to reflect in the style Mrs. Downs' identity as widow should be granted. *Garner* held that "[a]ny person may at any time be made a party if his presence is proper to a complete determination of the cause." Garner v. Ward, *supra,* 251 So. 2d at 257.[28] *See also,* Hall v. Louisville & N. R. Co., 157 F. 464 (C.C.N.D.Fla.

1907). Furthermore, apart from the Florida courts' characterization that the nonexistence of persons in a higher § 768.02 classification is substantive, under Rule 15, Fed.R.Civ.P., this court is empowered to grant an amendment amounting to a mere change in the description of a party which does not prejudice the defendant's case. Longbottom v. Swaby, 397 F.2d 45 (5th Cir. 1968).

*The Lakich Case*

In this case the parents of a decedent are suing on behalf of their granddaughter whom they adopted subsequent to her mother's death. Once again, the Government claims that the situation is one of an improper wrongful death plaintiff, and that under either of two theories recovery is impermissible. First, it is said that if the child's status under § 768.02 is determined at the time suit is filed, then the action is barred under Powell v. Gessner, *supra,* since she had been adopted then. As a part of this argument, the Government reads *Powell* as barring an adopted child's suit for the wrongful death of a natural parent, regardless of whether adoption occurred before or after the parent's death. Alternatively, the Government contends that if the child's status is determined at the date of the mother's death, then the cause of action belonged to either the administrator of the mother's estate, the father, who outlived the mother by a few seconds, or the administrator of his estate.

■■ It is clear under Florida law that the status of a child's right to sue for the wrongful death of a parent is determined at the parent's death. Powell v. Gessner, *supra;* Florida Power & Light Co. v. Bridgeman, 133 Fla. 195, 182 So. 911 (1938). Therefore, if the Government's first theory has any merit, it must be found in the contention that adoption of a child after its parent's death bars suit by the child for the parent's wrongful death. This is a novel argument indeed, and it formulates an

28. Rule 1.210(a), Florida Rules of Civil Procedure (1967), 30 F.S.A. Rule 1.250(c), vests in the trial court authority to add parties on motion or its own initiative.

---

interpretation of Powell v. Gessner which the court fails to discern. *Powell* stands for the proposition that dependents of a decedent occupy a higher priority under § 768.02 than do natural minor children of the decedent adopted by others prior to the parent's death. But here, the adoption not only occurred after the parent's death, but it was also the very act sued upon which made the subsequent adoption necessary. As pointed out by plaintiffs, the Government's position would require every minor child of deceased parents to remain an orphan in order to retain a cause of action for wrongful death. The subsequent adoption might conceivably affect the measure of damages, but it certainly does not destroy the cause of action itself.

Since adoption of the Giffe child by her grandparents does not disqualify her under § 768.02, the Government's second theory must fall if the child is not preceded by any other preferred statutory claimant. The Government suggests that the administrator of the mother's estate, the father, or, since the father had died, his personal representative, all have priority. That none of these persons would qualify as plaintiffs in this case is apparent from the Florida Wrongful Death Act itself. First, under § 768.02 the mother's administrator is a subordinate claimant to the mother's minor child whose cause of action, as found above, has not been destroyed by her adoption. Secondly, under no circumstances would the father's personal representative be a proper claimant under § 768.02, which provides that:

" . . . In case of the death of any person solely entitled, or of all the persons jointly entitled to sue, before action brought or before the recovery of a final judgment in action brought by him or them, the right of action or the action as the case may be, shall survive to the person or persons next entitled .to sue under this section . . . ."

Therefore, assuming that George Giffe, who momentarily survived his wife, ever had a cause of action for his wife's wrongful death, upon his death the right survived to his minor daughter, not to the administrator of his estate.

It might also be worthwhile to note in this regard that George Giffe could not have maintained this wrongful death action against the Government had he survived his self-inflicted wound.[29] This is so because Florida, as do most states, adheres to the philosophy that one should not be allowed to profit financially by his wrong. This principle is codified in § 731.31 of the Florida Statutes, F.S.A., which prohibits a murderer from inheriting from his victim, or from taking any portion of the deceased's estate as legatee or devisee. All death benefits pass through the murderer as though he had died during the decedent's lifetime. Florida has applied this principle in denying a wife the life insurance proceeds of her husband who she allegedly murdered,[30] and this result would undoubtedly extend to bar a murderer's wrongful death action based upon his victim's death.[31] The right of action, if any, would pass to the next preferred claimant who, in this case, is the murdered wife's minor daughter.

Though not raised by the Government, there remains for brief disposition the question of whether the doctrine of inter-spousal immunity poses a bar to suit in this situation. Assuming, for instance, that spousal immunity would have prevented Susan Lakich Giffe from suing her husband for his tort, then is their child subject to the same disability, and if so, does the im-

---

29. Needless to say, Giffe's theory of recovery would be exceedingly tenuous. The possibility is raised here in response to the Government's apparent contention that the cause of action for Mrs. Giffe's death vested first in George Giffe, her surviving spouse.

30. Carter v. Carter, 88 So.2d 153 (Fla.1956).

31. *See,* Strickland v. Atlantic Coast Line, 194 So.2d 69 (Fla.App.1967).

munity extend to the United States, in essence an alleged joint tortfeasor with the father? The rule in Florida apparently is that inter-spousal immunity does not bar suit by a child against the father for the wrongful death of the child's mother. Shiver v. Sessions, 80 So.2d 905 (Fla.1955). *Shiver*, which involved a wrongful death action by a child against the estate of its father who had murdered the child's mother, stated that not only did the traditional reasons for spousal immunity no longer exist, but also that the Wrongful Death Act creates a separate cause of action in specified parties for injury to them occasioned by the decedent's wrongful death. Further, even were the father immune from suit by his child, the United States would not be since Florida apparently follows the general rule that a joint tortfeasor will be liable for his own tortious conduct notwithstanding the immunity of the spouse who joins with him in producing an injury. *See,* May v. Palm Beach Chemical Co., 77 So. 2d 468 (Fla.1955); Prosser, Torts, at 868 (4th Ed. 1971).

## DAMAGES

In Florida, damages for death by wrongful act arise under two distinct statutory rights of action. The Wrongful Death Act, §§ 768.01, 768.02, Florida Statutes, F.S.A.,[32] is patterned after the English "Lord Campbell's Act" and creates in certain beneficiaries a cause of action for damages they sustain by reason of the decedent's death. A separate right of action exists under the Survival Statute, § 46.021, Florida Statutes, F.S. A., which revives in a decedent's personal representative the cause of action which the deceased could have brought had he survived his injury. In this instance, the representative may recover on behalf of the estate what the deceased could have recovered in his action, and includible are such elements as the deceased's pain and suffering, medical and other expenses necessitated by the injury, and earnings lost between the dates of injury and death. A person entitled to sue under both statutes may bring a combined wrongful death-survival action and thereby be afforded a complete recovery of damages in a single proceeding.

The measure of damages in a widow's wrongful death action has been set out to be:

"(1) Her loss of the comfort, protection and society of the husband in the light of all the evidence in the case relating to the character, habits, and conduct of the husband as such. (2) The marital relations between the parties at the time of and prior to his death. (3) His services, if any, in assisting her in the care of the family. (4) The loss of support which the husband is legally bound to give the wife, which is based on his probable future earnings and other acquisitions. (5) The station in society which his past history indicates that he would probably have occupied and his reasonable expectations in the future, such earnings and acquisitions to be estimated upon the basis of the deceased's age, health, business capacity, habits, experience, and energy, and his present and future prospects for business success at the time of his death— all of these elements to be based upon the probable joint lives of the widow and husband. (6) She is also entitled to compensation for loss of whatever she might reasonably have expected to receive in the way of dower or legacies from her husband's estate in case her life expectancy be greater than his—the sum total of all these elements to be reduced to a monetary value, and its present worth to be given as damages." Dina v. Seaboard Air Line Ry. Co., 90 Fla. 558, 106 So. 416, 417 (1925).

Although damages are measured by the loss to the statutory beneficiary personally, the Florida courts have con-

32. *See,* n. 24, *supra.*

strued § 768.02 to include as an element of damages recoverable by a widow with a minor child or children fathered by deceased the loss of financial support and care and attention that her husband would have provided the children during the period of their minority. Director General of Railroads v. Into, 83 Fla. 377, 91 So. 269 (1922); Slaughter v. Cook, 195 So.2d 6 (Fla.App.1967).

The Florida cases are a bit confusing on the question of whether a decedent's lost future earnings and estate are proper elements of recovery in a wrongful death action. It is well settled Florida law that an administrator suing under § 768.02 is entitled to recover "the present value of the prospective earnings and savings which the evidence indicates the decedent could reasonably have expected to have accumulated during his life expectancy . . . and to have left to his heirs or beneficiaries at his death." Hardison v. Threets, 241 So.2d 694, 695 (Fla.App.1970), rev'd. on other grounds sub nom Threets v. Hardison, 255 So.2d 267 (Fla.1971), citing Jacksonville Electric Co. v. Bowden, 54 Fla. 461, 45 So. 755, 757–758 (1908); Ake v. Birnbaum, 156 Fla. 735, 25 So.2d 213 (1945). It has not always been made clear, however, whether such an award may be claimed by the statutory beneficiaries of higher priority, i. e., surviving spouse, minor children, or dependents.

Plaintiffs rely on Hardison v. Threets, supra, in contending that Mrs. Downs and Susan Lakich are entitled to recover their decedents' lost future earnings. While Hardison is miscited for this proposal since suit there was by a father as administrator of the estate of his deceased minor son, the Florida Supreme Court in Dobbs v. Griffith, 70 So.2d 317 (Fla.1954) apparently did approve a widow's recovery of her husband's prospec-

tive earnings in a combined suit brought by her as widow and administratrix under the wrongful death and survival death statutes.[33] Further, plaintiffs, as do some Florida courts, apparently read the sixth element of damages set forth above in *Dina* to mean that a widow is entitled to recover for loss of the husband's probable prospective estate or at least the value of her expected inheritance.

■ Except for the apparent implications of Dobbs v. Griffith, *supra*, however, the court has not found nor been directed by the parties to any Florida decision holding that a decedent's prospective earnings and estate are proper elements of damages in a § 768.02 action brought by anyone other than the decedent's administrator. Moreover, Ellis v. Brown, 77 So.2d 845 (Fla.1955), expressly recognizes that the present value of a decedent's prospective earnings and estate are recoverable *only* in the administrator's wrongful death action.[34] While the *Ellis* holding was limited to the issue of an administrator's recovery under the survival statute for impairment of earning capacity beyond the decedent's death,[35] the opinion contains a good discussion of this element of damages as it applies to both the wrongful death and survival statutes. The following portion of that discussion clearly signifies that under the Florida Wrongful Death Act, neither Mrs. Downs as widow nor Susan Lakich as a minor child can recover for the earning capacity diminutions or prospective estate losses of their respective decedents:

"As further evidence of the peculiarity of our Wrongful Death Act, it might be noted that where the deceased person left neither spouse nor child or other person dependent upon him for support, so that the cause of

---

33. While saying that prospective earnings were properly recoverable, the court failed to specify in which action the recovery was being allowed.

34. *Accord*, Florida Cent. & P. R. Co. v. Foxworth, 41 Fla. 1, 25 So. 338 (1899).

35. *Ellis* limited the administrator's recovery for lost earnings in a survival statute action to the period between the decedent's injury and death.

action devolves upon the administrator of his estate, such administrator can recover the full value of the loss of prospective estate of the decedent, reduced to present worth. [Citations omitted.] So, again, it might be said that it is cheaper to kill a person who leaves a spouse or child . . . than it is to kill a person who is survived by no one in the designated classes." *Id.* at 849.

Therefore, a decedent's probable future earnings, had he lived, are relevant to a spouse's or minor child's damages only as a measure of the amount decedent would have had available to contribute to their care and support, and as an index of his ability to attain a station in society which with him they would have shared. The decedent's prospective estate is also relevant to a widow's damages, but only to the extent of her reasonable expectations in the way of dower or legacies from that estate. Dina v. Seaboard Air Line Ry. Co., *supra.*

The elements of damage recoverable by a minor child for the wrongful death of a parent have been outlined as follows:

"A minor child's claim for damages for the death of its father by the wrongful act of another . . . is based on these elements as qualified: (1) The loss of support which the father is in duty bound to give his child during its minority, based on the evidence of his probable future earnings and other acquisitions, such earnings and acquisitions to be estimated upon the basis of father's earnings in the past, his age, health, business capacity, habits, experience, and energy, and his present and future prospects for business success at the time of his death; and (2) the loss of attention, care, comfort, companionship, protection, education, and moral training of the father which might reasonably

have been anticipated in the light of the evidence relating to the character and conduct of the father as such. These elements to be based on the probable life of the father. The sum total of all these elements to be reduced to a monetary value and its present worth to be given as damages." Pidcock-Jones Co. v. Watson, 141 Fla. 376, 193 So. 305, 306 (1940); *see also,* Powell v. Gessner, *supra,* 231 So.2d at 52.

Thus, as was true for a widow, a child's recovery is measured principally by lost support together with an amount to compensate for the loss of those intangible aspects of a parent-child relationship such as love, companionship, and training. The assessment is only for the child's minority, and unlike a widow's right to dower or legacy expectancies, the court finds no Florida authority to support plaintiffs' contention that a child is entitled to any sort of recovery based upon the parent's probable prospective estate.

Looking to the quantum of proof necessary to justify a damage award based on a decedent's earning capacity, which in this case is lost support, Florida courts have repeatedly held that the evidence need do no more than furnish the court or jury a reasonable basis for computation. Burch v. Gilbert, 148 So.2d 289 (Fla.App.1963); Miami Dairy Farms, Inc. v. Tinsley, 115 Fla. 650, 155 So. 850 (1934); Hardison v. Threets, *supra*[36]. Factors to be considered include the deceased's past earnings, if any, age, health, life expectancy, habits, business capacity, skill, and reasonable future expectations. Dina v. Seaboard Air Line Ry. Co., *supra*; Hardison v. Threets, *supra*; Pidcock-Jones Co. v. Watson, *supra.* The value to be ascribed to a widow's or child's loss of the society and services of a deceased husband or parent can quite obviously not be calcu-

---

36. *Hardison,* in assessing an administrator's recovery for the prospective earnings and estate of his deceased four-year-old son, said generally that some award may be made even though no earning capacity is proved, as long as the amount is reasonable under all the circumstances.

lated in accordance with a formula nor be reduced to mathematical certainty; it is enough for the claimant to offer some evidence of the quality of the lost relationship and for the court or jury, to then stay within reasonable bounds in making an award. Frazier v. Ewell Engineering & Contracting Co., 62 So.2d 51 (Fla.1952).

Plaintiffs apparently make an additional damage claim for Mrs. Downs' mental distress following her husband's death. However, despite a possible indication to the contrary in Guarniere v. Henderson, 171 So.2d 617 (Fla.App.1965), Florida law seems clear that in a wrongful death action plaintiff's mental anxiety or distress over the decedent's death is not a proper element of damages, nor is the decedent's own pain and suffering prior to death. See, Dina v. Seaboard Air Line Ry. Co., supra; Ake v. Birnbaum, supra.

The parties have taken opposing positions on whether federal income taxes which a decedent would have paid on future earnings should be deducted in computing earnings-related damages. Taxes will obviously restrict the amount of money a decedent would have had available to contribute to his family's welfare, and under the Florida Wrongful Death Act it is only actual support and not the earnings from which it comes which measures this element of a widow's or child's recovery. Therefore, it necessarily follows that the support computation be based on after-tax income. This result obtains from the provisions of the Florida Wrongful Death Act, and the court therefore need not reach the question of whether tax consequences must be considered in injury or death cases where damages are measured by lost or diminished earning capacity per se.

With these general principles in mind, the court turns now to consideration of the evidence in the two wrongful death actions herein.

### The Downs Case

Brent Downs was 29 years old when he died, and according to mortality tables could have expected to live another 41.16 years and worked 32.66 years.[37] He and his wife had been married seven years, had one son 19 months of age and were expecting another child at the time of his death. This child, a second son, was born approximately two months later. The decedent was a high school graduate, and had pursued intermittently a college education prior to embarking upon a career in aviation. He had been employed at BBAI for over three years as a charter pilot and flight instructor, and was regarded by his employer as an exemplary pilot. Well certified by the FAA for his occupation, Downs was an instructor-rated commercial pilot with instrument and airline transport ratings. He enjoyed good health and had no known physical disabilities.

The evidence indicates that Downs was receiving a gross monthly salary from BBAI of $800 at the time of his death, and that this was the most he had ever earned. After taxes and other deductions, his take-home pay came to about $600 a month, and Mrs. Downs testified that their family of three consumed most, if not all, of this amount. Six months before his death, the decedent began part-time work as a licensed realtor in order to supplement his salary, and had succeeded in selling one home for which he received a $500 commission. The family had no source of income other than the decedent, and Mrs. Downs related that her husband was frugal in his self-expenditures and, in her opinion, expended only about 15 per cent of his income on himself. The court accepts this estimate as reasonable, and since the record reveals that the decedent had been unable to accumulate any savings in the past, and since in all likelihood his future savings would not have comprised an appreciable amount of his earnings, the court shall fully ap-

37. Department of Health, Education and Welfare Mortality Tables (1968).

ply the remaining 85 per cent of decedent's net yearly income towards support of his wife and children. For the years after the children reach 21, the court concludes that 60 per cent is a reasonable proportion of decedent's net income which would have gone to support his wife.

Based upon a work life expectancy of approximately 33 years, Mrs. Downs' allowable recovery for lost support discounted to present value is as follows:

Lost Support for Self and Children (20 years [38])

| ($9600) (.85) | = | $8160 per year | |
| ($8160) (12.4622 [39]) | = | | $101,692 |

Wife's Lost Support After Children Grown (13 years)

| ($9600) (.60) | = | $5760 per year | |
| ($5760) (9.3936) | = | $54,107 | |
| Present value of $54,107 due in 20 years at 5%: (54,107) (.3769) | = | | 20,393 |
| | Total Lost Support | = | $122,085 |

———◆———

The above calculations are based upon an average yearly after-tax income of $9,600. This is slightly more than decedent's $7,200 net yearly earnings at the time of his death, but based upon his age, health, habits of industry and future prospects for success, the court finds this estimated increase to be reasonable under all the circumstances. Further, the Florida wrongful death cases relate lost support to a decedent's probable future earnings, and in doing so give weight to the above mentioned factors.

The remaining portion of damages recoverable by Mrs. Downs for her own behalf and on behalf of her two children is the monetary value of the lost husband-father relationship. This relationship consisted of such things as the deceased's comfort, protection, society, marital relations between the wife and husband, services he rendered to the family unit, the attention, companionship, education, and moral training he provided for his children, and the sta-

tion in society he could have provided for his family. In some families these things might amount to very little; in others the value might far exceed the ability of any defendant to compensate for the loss. In any case it is extremely difficult to place a price on a widow's and her children's loss of the many intangible aspects of the destroyed family relationship.

The evidence in the Downs case reflects that Brent Downs was a man devoted to the welfare of his wife and son; the three of them were very close and were accustomed to doing things together as a family. In addition to performing the normal household duties of a husband, Downs possessed skills which enabled him to do much of the repair work in the home, including electrical and plumbing work. During the months immediately preceding his death, he shouldered a heavier than normal amount of responsibility in assisting with household duties and caring for their infant son, due to his wife's pregnancy and

38. The oldest son, who was almost two years old at his father's death, may claim lost support for 19 years. The youngest son, born after Downs' death, may claim lost support for 21 years. The average of 20 years is used herein for computation purposes.

39. The present value of $1.00 per annum for 20 years with 5% interest compounded annually. This and other discount figures used herein may be found in T.C.A. Vol. 1, p. 1171.

partial incapacitation with a lower back ailment. The evidence indicates that Downs was industrious and exerted continuing efforts to better himself and the life he could provide for his family.

In short, the court finds that Brent Downs' death constituted a substantial loss in the lives of his wife and two children. There is no formula by which this intangible loss may be measured monetarily, but the court in its discretion deems the following awards appropriate: for Mrs. Downs, $5000 per year for her husband's life expectancy of approximately 41 years;[40] for each of her two sons, $2400 annually until each reaches the age of 21. Discounted to present value, these amounts yield the following damages:

Wife's Loss of Husband's Society, Etc. (41 years)

($5000) (17.2944) = $ 86,472

Sons' Loss of Father's Society, Etc. (20 years)

($4800) (12.4622) = $ 59,819

Total = $146,291

Funeral expenses of $1,065 claimed by Mrs. Downs are also a recoverable element of her damages in this case. Although funeral expense is not recoverable in a wrongful death action brought by a surviving spouse, the decedent's personal representative can recover for funeral expenses in a survival action. Sinclair Refining Co. v. Butler, 190 So.2d 313 (Fla.1966). Since Mrs. Downs may sue as both the surviving spouse of Brent Downs in the wrongful death action and the administratrix of his estate under the survival statute, she qualifies in the latter capacity to recover the decedent's funeral expenses.[41]

Reasonably expected dower or legacies from a husband's estate form a portion of a widow's wrongful death damages, Dina v. Seaboard Air Line Ry. Co., supra, but plaintiff introduced no proof of these items to justify their inclusion in the damages computation.

Therefore, had the United States been held liable for her husband's death, the total damages awardable to Mrs. Downs for herself and on behalf of her two children would be as follows:

| | | |
|---|---|---|
| A. | Lost Support | $122,085.00 |
| B. | Society, Etc. | 146,291.00 |
| C. | Funeral Expenses | 1,065.00 |
| | Total Damages | $269,441.00 |

*The Lakich Case*

The elements of a minor child's damages for a parent's wrongful death have previously been quoted from Pidcock-Jones Co. v. Watson, supra. In substance, these damages are measured by

40. The court finds this figure to be in line with damages awarded by Florida courts in compensating a widow for the loss of her spouse's relationship. *See, e. g.,* Ward v. Orange Memorial Hospital Assn., Inc., 193 So.2d 492 (Fla.App.1966) (award of $125,000 to widow whose deceased husband had a 14-year life expectancy held not excessive).

41. In her capacity as administratrix in the survival action, Mrs. Downs is also entitled to recover for the decedent's pain and suffering and diminished earning capacity between injury and death. Ellis v. Brown, *supra.* However, neither is appropriate here since the decedent apparently died instantly.

loss of support during the child's minority together with an amount to compensate for the child's loss of its parent's companionship, care, training, and other intangibles.

 The proof introduced by plaintiffs in the Lakich case included, among other things, an itemized list of expenses which the child's adoptive parents anticipate they will incur in rearing and educating their granddaughter until she completes her college education. While the court finds commendable the adoptive parents' concern with their granddaughter's welfare and their willingness to accept the many responsibilities of raising her, these estimated costs are not properly recoverable by the child in an action under the Florida Wrongful Death Act. Further, as previously discussed, the child is not entitled to recover for her mother's lost earning capacity during the mother's work-life expectancy, but may recover only lost support which would have been derived therefrom during her minority.

Susan Lakich Giffe was 25 years old at her death, and had a life expectancy of 39 years out of which she could have been expected to actually work approximately 21 years according to female labor force participation rate tables.[42] At her death, Susan Giffe was a cashier in a Nashville hotel dining room where she had been employed four days and was earning approximately $2.00 per hour. She had not been employed during the preceding three years, but had been accepted to teach in the Nashville Metropolitan school system in May, 1968. However, she resigned in July, 1968, before assuming her teacher's position. Her past work experience consisted of summer employment in jobs of a clerical nature while she was a student.

Mrs. Giffe had a master's degree in education, and had reapplied for teacher employment in the Nashville school system in September, 1971. She was qualified for a position, and on the basis of her application, credentials and previous offer of employment, the school system's personnel director stated that it was possible that she could have been offered employment during the 1971 school year at a starting salary of $7,616.00. However, he did relate that only about 25% of all applicants were successful in gaining employment during that period.[43]

Thus, in the Lakich case there is presented the situation of a child seeking damages for the lost financial support of a mother without a proven past earnings record who had applied for a $7600 per year teaching position for which she was qualified but had not been accepted at the date of her death. Defendant asserts that this is insufficient evidence of earning potential on which to base an award for lost support. However, as previously stated, some award based on prospective earnings may be made even in the absence of a proven earning capacity if the amount is reasonable under all the circumstances. Hardison v. Threets, *supra*.

The court finds that the evidence in this case justifies the finding that the decedent would have been successful in gaining employment in the teaching profession, and that she would have been gainfully employed elsewhere until that opportunity arose. On the basis of the mother's reputation, education and credentials, the court further finds that $6783 per year is reasonable as the amount Mrs. Giffe would have had avail-

---

42. According to the expert witness, per Department of Health, Education and Welfare mortality tables (1968), the labor force participation rate of married women not living with their husbands varies from approximately 50% at age 26 to approximately

29% at age 64. Using the applicable rate for each year from age 26 through 64, the expert calculated that Susan Giffe would have worked approximately 50% of the time.

43. This percentage was said to have decreased somewhat in ensuing years.

able to support herself and her daughter.[44]

No evidence was introduced to indicate what percentage of her available income Mrs. Giffe would have used for her daughter's support. Of course in this case, unlike the Downs case in which the decedent's widow was present to testify, the child's parents, who would have been the best sources of past support information, were both dead. The court does not conclude that the absence of such evidence necessitates a complete denial of support damages, and in its discretion finds that 40 per cent of Mrs. Giffe's after-tax income could reasonably be expected to have been used for her daughter's support.

The decedent's daughter was almost two years old at her mother's death and is therefore entitled to claim support damages for 19 years. Once again, the child's adoption by her grandparents does not destroy her cause of action for her mother's wrongful death. And, since the adoption was a direct result of defendant's allegedly wrongful act, the court finds that the adoption does not alter the amount of damages awardable.[45] It has already been mentioned that Mrs. Giffe would have been employed approximately 50% of the time between the ages of 25 and 64 according to labor force participation tables. However, there is no way to determine from this statistic in what years of her life she would not have been employed, and it is also possible that she could have worked much more than the tables depict.[46]

Therefore, the court will compute damages for lost support on the assumption that Mrs. Giffe would have been continually employed during the period of her child's minority and that periods of unemployment would more likely have occurred after her daughter was grown.

The court must be somewhat arbitrary in assessing damages for the child's loss of her relationship with her deceased mother since the record is devoid of any reference to the quality and characteristics of that relationship. While neither the child nor the mother was able to testify, the child's adoptive grandfather was called to testify about other matters and could have been examined about this as well. Nevertheless, a mother's death constitutes a severe loss in the lives of most children, and while without some proof it cannot be assumed that the mother-daughter relationship here was an extraordinarily close one, the court does consider that an award of $2000 per year for this element of damages would be reasonable.

■ The Lakiches also claim as damages their daughter's funeral expenses which they incurred. Since it has not been shown that either Major or Mrs. Lakich was the personal representative or administrator of their deceased daughter's estate, and since their suit is on behalf of a minor who did not incur these expenses, the court is unable to include funeral expenses in the damages computation. Sinclair Refining Co. v. Butler, *supra*.

■ Therefore, on the basis of the above findings, the amount of damages

---

44. This amount is based on a gross yearly income of $7600 with federal income tax deducted at 1974 tax rates for the head of a household not itemizing deductions.

45. In Florida Power & Light Co. v. Bridgeman, *supra*, the court held that the marriage of a plaintiff minor child after the death of her mother for which suit was brought did not affect the child's right to sue but did limit the quantum of damages. Such a limitation should not apply in this case, how-

ever, since a child's marriage is not a direct result of the parent's death, whereas the Giffe's daughter's adoption was such a result.

46. The tables are for all married women living apart from their husbands, and it seems reasonable to assume that a widow would seek employment more frequently than a woman separated from her husband but who might still receive financial support from him.

recoverable by plaintiffs Major and Mrs. Joseph S. Lakich as legal guardians and next friends of Susan Germaine Lakich would be:

Lost Support (19 years)

| | | |
|---|---|---|
| ($6783) (.40) | = | $2713 per year |
| ($2713) (12.0853) | = | $ 32,787 |

Daughter's Loss of Mother's Society (19·years)

| | | |
|---|---|---|
| ($2000) (12.0853) | = | 24,171 |
| | Total Damages | $ 56,958 |

---

*Damages—BBAI*

Florida courts have adhered to the Restatement, Torts § 928 (1938) in awarding damages for harm to chattels not amounting to a total destruction in value. The elements of compensation as quoted in Airtech Service, Inc. v. MacDonald Construction Co., 150 So.2d 465, 466 (Fla.App.1963) are:

"(a) the difference between the value of the chattel before the harm and the value after the harm or, at the plaintiff's election, the reasonable cost of repair or restoration where feasible, with due allowance for any difference between the original value and the value after repairs, and

(b) the loss of use."

*See also*, Travelers Indemnity Co. v. Skyway Marine, Inc., 251 So.2d 327 (Fla.App.1971); Meakin v. Dreier, 209 So.2d 252 (Fla.App.1968); Wajay Bakery, Inc. v. Carolina Freight Carriers Corp., 177 So.2d 544 (Fla.App.1965).

BBAI makes the following claims for damages sustained by 58 November:

| | | |
|---|---|---|
| 1. | Repair of Aircraft (stipulated) | $ 42,131.98 |
| 2. | Difference between value before damage and after repairs | 67,018.75 |
| 3. | Loss of Income | 7,240.00 |
| 4. | Personnel replacement costs | 24,150.00 |
| 5. | Executive loss of time | 5,943.60 |
| | Total damages | $146,484.33 |

---

The aircraft repair cost of $42,131.98, expended primarily for overhaul of the damaged right engine,[47] is a proper element of recovery. Plaintiff contends, however, that the aircraft's value after repairs was $67,018.75 less than its value immediately before this incident occurred. This loss is said to represent the difference between a cost of $336,018.75 less depreciation of $54,000, and the $215,000 proceeds of the aircraft's sale following repairs. A portion of this loss in value is attributable to the aircraft's damaged interior which was not repaired.[48] Plaintiff's chief pilot estimated that interior replacement cost, which could range from $3,000 to as much as $20,000, depending on the interior chosen, would have run $11,000 to $12,000. It seems obvious to the court

---

47. $38,085.60 for engine repair.

48. Interior damage apparently consisted of three bullet holds in the pilot's seat from shots fired by Giffe, and blood-stained upholstery.

that this estimated expenditure, based upon complete replacement of interior appointments, would have restored the aircraft's interior to a greater value than existed prior to the damage. The enhanced value is not recoverable, and on the basis of the evidence introduced, the court finds that $5,000 is a reasonable estimate for interior repairs recoverable as a portion of the aircraft's diminished value.

The sale price is the only evidence of the aircraft's value after repairs, and there is no indication that BBAI negotiated with anyone other than the purchaser. The aircraft was sold for $175,000 cash and another aircraft valued in the sale at $40,000. Plaintiff sold this aircraft approximately one month later for $50,000. Notwithstanding plaintiff's profit objective as an aircraft dealer, it seems likely that this $10,000 difference was more attributable to an undervalued basis than to profit, and that 58 November's after-repair value was therefore closer to $225,000 than to $215,000.

Assuming that plaintiff's submitted depreciation value figure of approximately $282,000 accurately reflects 58 November's value before damage,[49] the amount claimed as damages for the difference in value before the injury and after repairs is approximately $52,000.[50]

Plaintiff attributes this loss in value to a stigma attached in the aircraft industry to previously damaged aircraft generally, and in this case to the nature of the incident and damage. Upon reviewing all the evidence, the court is unable to accept this loss as one realistically attributable solely to defendant's acts, particularly since the repairs restored 58 November to an equivalent pre-incident airworthiness condition.[51] While recognizing that damage history would be expected to affect the market value of aircraft, and perhaps to a greater extent than that of other chattels such as automobiles, the court considers that $15,000 would adequately compensate plaintiff for this element of its loss.

The second element of damages recoverable under Florida law, loss of use, is claimed by BBAI in the amount of $7,240 for loss of charter income during 58 November's period of nonavailability. However, plaintiff introduced no credible evidence in support of this claim, and the court therefore finds no basis on which to make any award for loss of use. Further, the court finds no basis for making an award for personnel replacement costs and executive loss of time as claimed by plaintiff.

▉ Therefore, total damages recoverable by BBAI would be:

| | | |
|---|---|---|
| A. | Repair costs incurred | $42,131.98 |
| B. | Loss in aicraft value due to damaged interior | 5,000.00 |
| C. | Difference between value before damage and after repairs (excluding estimated interior repair cost) | 15,000.00 |
| | Total Damages | $62,131.98 |

---

49. Plaintiff's chief pilot offered $280,000 as his opinion of the approximate market value of comparable Hawk Commander aircraft in this region at the time of the sale.

50. $282,000 less a court-adjusted sale price of $225,000, less a $5,000 cost of interior restoration.

51. Plaintiff did not have a good earnings record in aircraft sales, and was in the process of closing out its sales operation during this period.

## SOVEREIGN IMMUNITY

The principal issue presented by this case is whether the United States has consented to being sued for the acts which are alleged to constitute a right of action under the Tort Claims Act. The Government asserts that it has not, and advances two lines of reasoning in support of its position. First, the suit is said to involve causes of action exempted from the Act in what has become known as the discretionary function exception. Secondly, the Government contends that even if the allegedly wrongful acts do not fall within this exception, the United States cannot be vicariously liable under the Act for the torts of employees who would themselves be immune from the instant lawsuits. This combined defense focuses attention upon governmental immunities generally, and, in particular, upon the extent to which the sovereign's immunity has been waived in the Tort Claims Act.

The general notion that a sovereign cannot be sued by its subjects has ancient roots in English jurisprudence as an outgrowth of the precept "the king can do no wrong." While an acceptance of the Crown's infallibility did not come across to America, this derivative doctrine of the sovereign's immunity from suits to which it has not consented did. Strangely enough, however, our early courts offered few reasons for continuing to enforce immunity, and the doctrine enjoyed for years a virtually unchallenged existence.[52] As recently as 1907 Mr. Justice Holmes, a notable proponent of sovereign immunity, declared for a unanimous Supreme Court that "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends."[53]

When the motivation for immunity was sought to be explained, it was generally anchored to the fear that functions of government would be crippled should individuals be free to challenge in court the manner in which those functions were performed. An 1868 Supreme Court decision found it "obvious that the public service would be hindered, and the public safety endangered, if the supreme authority could be subjected to suit at the instance of every citizen . . . ."[54] Such justifications became less compelling as the variety of activities undertaken by the federal government expanded and produced an increasing number of wrongs which lay remediless behind the cloak of sovereign immunity. Relief was afforded many private claimants through the rather unwieldy process of private bills in Congress, the number of which grew steadily over the years. Whether in response to the increasing burden on Congress or to a growing awareness that Government tort liability is often justified, more recent years have witnessed the gradual demise of an unquestioned application of sovereign immunity, and the growing trend of American lawmakers and courts, both state and federal, has been to expand the concept of governmental responsibility.[55]

As a part of this trend, the Federal Tort Claims Act swept aside a large portion of the Government's immunity for the tortious conduct of its employees, and permitted the federal courts to determine whether private claimants have suffered redressable wrongs at the hands of the Government. The Act provides that the United States shall be liable, except for punitive damages,

---

52. " . . . the principle has never been discussed or the reasons for it given, but it has always been treated as an established doctrine." United States v. Lee, 106 U.S. 196, 207, 1 S.Ct. 240, 250, 27 L.Ed. 171 (1882).

53. Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907).

54. The Siren, 74 U.S. (7 Wall.) 152, 154, 19 L.Ed. 129 (1868).

55. *See generally*, Davis, Administrative Law Treatise § 25.17 (1970 Supp.).

". . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

The scope of tort claims recognized by the Act is not unlimited, however, and 28 U.S.C. § 2680 defines certain areas in which the immunity of the sovereign remains intact. One of the most litigated, and certainly the most problematic of these exceptions, is the second portion of § 2680(a) which exempts from Government liability

"[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Relying upon the above-quoted section, the Government contends that plaintiffs' claims are based upon the performance of a discretionary function and thus are not actionable. The threshold question in this case, therefore, is whether the decisions made and actions taken by agents of the FBI in handling the hijack of 58 November were the exercise of a discretionary function within the meaning of § 2680(a). Since the discretionary function exception is regarded as jurisdictional, an affirmative response to this question will preclude the court from further consideration of plaintiffs' suits for negligence and trespass to chattels.

The scope of the discretionary function exception has been central to a

great number of cases brought under the Tort Claims Act, and the decisions reflect the great difficulty experienced by courts in attempting to delineate precise boundaries for "discretionary" activity. Almost without exception, however, since 1953 Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427 (1953) is cited by courts as the starting point in determining what activity Congress sought to exempt from tort liability.

*Dalehite* involved claims against the United States totaling two hundred million dollars for deaths and property loss occasioned by the explosion of a shipload of ammonium nitrate fertilizer produced and distributed under Government control and supervision for export to certain occupied countries at the close of World War II. Despite the district court's finding of Government negligence, the Supreme Court denied recovery since the negligent acts were found to have occurred in the performance of a discretionary function. Of all the factors mentioned in support of this decision, perhaps most cited is the Court's statement that the "decisions held culpable *were all responsibly made at a planning rather than operational level* and involved considerations more or less important to the practicability of the Government's fertilizer program." *Id.*, at 42, 73 S.Ct. at 971. (Emphasis supplied.)

The planning-operational distinction has been given considerable emphasis by numerous courts in setting parameters for § 2680(a),[56] and the instant parties as well have devoted much attention to whether Agent O'Connor acted in a planning or operational role in the Jacksonville episode. As an analytical tool, however, the distinction is of marginal value in resolving all but the most obvious cases. For instance, the driving of an automobile by a government em-

---

56. *See, e. g.*, American Exch. Bank of Madison, Wis. v. United States, 257 F.2d 938 (7th Cir. 1958) ; Eastern Air Lines v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62 (1955), aff'd. per curiam sub nom., United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955). *cf.*, United States v. Gregory, 300 F.2d 11 (10th Cir. 1962).

ployee is quite easily seen as operational activity as contrasted to the obvious planning level endeavors of the Secretary of State in negotiating a treaty. Between these two extremes, however, there exist an infinite variety of decisions and decisionmakers less susceptible of such characterization; the activity of FBI agents in attempting to apprehend a hijacker is such a case. In any event, to be avoided is what one commentator has criticized as a

". . . tendency of the federal courts to emphasize the literal meaning of the term 'discretionary,' along with a tendency to assume that anything in the nature of 'planning' calls for immunity, . . . . Those tendencies are undesirable because liability for highly discretionary action is often appropriate, since liability for such action can often be imposed without undue judicial assumption of functions that can be better performed by administrators or executives." Davis, supra, at 846.

Particularly in the instant case, a meaningful inquiry into the scope of the discretionary function exception must focus upon the reasons for sovereign immunity and purposes sought to be achieved by its qualified abolition in the Tort Claims Act.

The legislative history of the Act speaks of § 2680(a) as a

"highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a flood-control or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious . . . ." H.R.Rep. No. 1287, 79th Cong., 1st Sess., pp. 5–6 (1945).

The Court in Dalehite, referring to the above, stressed that the Act's waiver of immunity was not to encompass acts of a governmental nature or function, and characterized the "discretion" protected by § 2680(a) as ". . . the discretion of the executive or the administrator to act according to one's judgment of the best course . . . ." Dalehite v. United States, supra, 346 U.S. at 34, 73 S.Ct. at 967. Although discretionary immunity was thus referenced to executive or planning-level activity, the Court made it clear that protection extended to the actions of lesser officials charged with implementation of discretionary plans and programs:

"It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." Dalehite v. United States, supra, at 36, 73 S.Ct. at 968.

Despite the emphasis given by Dalehite to activity of a governmental nature, Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L. Ed. 48 (1955), expressly rejected the idea that liability under the Tort Claims Act may exist only for negligence occurring when the Government acts in a proprietary rather than uniquely governmental capacity. Rather, liability under the Act is imposed where negligent conduct under similar, not identical, circumstances would be actionable against a private individual under state law, notwithstanding that private individuals do not perform the precise activity involved. Further, in imposing liability for damages resulting from Coast Guard negligence in operating a lighthouse, the Court in Indian Towing found that while the decision to undertake the lighthouse service was discretionary, there was no discretion to provide the

service in a negligent manner.[57] Likewise, the Court in Rayonier v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L. Ed.2d 354 (1957), held that § 2680(a) did not exempt the United States from liability for the negligence of Forest Service employees in fighting a forest fire. The case was remanded for consideration of whether the alleged negligence would be sufficient to impose liability on a private person under the laws of the State of Washington, the place where the fire occurred.

It is well to note that both *Indian Towing* and *Rayonier* are cases concerned principally with interpreting 28 U.S.C. § 2674, and which involved the negligence of agents admittedly engaged in "operational" activity. Nevertheless, the decisions are an instructive analysis of the policies embodied in the Tort Claims Act, and in *Rayonier* the following language reflects what this court views as an expanded concept of claims within the Act's coverage:

> "It may be that it is 'novel and unprecedented' to hold the United States accountable for the negligence of its firefighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented government liability." *Id.*, at 319, 77 S.Ct. at 377.

The rules governing discretionary functions are more easily stated than applied, and where discretion ends and actionable negligence begins must ultimately be determined on a case by case adjudication. In this process courts have employed varying rationales in reaching often inconsistent conclusions, and little could be gained by cataloging in this opinion the many cases which have purported to circumscribe the limits of governmental tort liability.[58]

 Despite the growing conviction that the sovereign, like others, should be accountable for its wrongs, it seems clear that the conduct of certain types of governmental activity must remain free from the effects of litigation. Basically, the exemption for discretionary functions seeks to insulate from judicial inquiry the propriety of basic policy decisions made by officials of coordinate branches of government in whom are vested broad and pervasive decision-making responsibility. The rule contemplates those situations in which a court cannot undertake to determine the reasonableness of complex governmental decisions. Also, implicit in the concept of protection for discretionary acts is the probable effect which potential liability would have in dampening the ardor of those charged with the formulation and execution of governmental programs. The test for immunity, then, should be whether injury inflicted as a result of government action can be subjected to judicial review without thereby jeopardizing the quality and efficiency of government itself.

 Under these standards, it is clear that the substance of any hijacking plan or procedure formulated by the Department of Justice through the FBI or its executive officials could not be the subject of civil litigation under the Tort Claims Act. This would be true even though the plan called for activity clearly negligent adjudged by traditional tort principles. Moreover, in order to achieve the purposes for which exemption from liability is deemed necessary, it is obvious "that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." Dalehite v. United States, *supra*, 346 U.S. at 36, 73 S.Ct. at 968. Thus, as urged by the Government, it is of no real moment that the allegedly negligent government

---

57. "One who undertakes to warn the public of danger and thereby induces reliance must perform his 'Good Samaritan' task in a careful manner." Indian Towing Co. v. United States, *supra*, at 64, 65, 76 S.Ct. at 124.

58. See United Air Lines v. Wiener, 335 F.2d 379, 393 (9th Cir. 1964) for such a list.

agents in this case were operating at the "field" level rather than at a policy-making level. The inquiry does not stop here, however, for, even assuming that there was in existence a "discretionary" policy of the FBI on hijacking, the previously quoted statement from *Dalehite* clearly implies that protection only extends to acts of subordinates accomplished "in accordance with official directions . . . ." Reference to this distinction is made in numerous cases, and it is generally agreed that the negligent performance of a discretionary plan or policy can support a suit for damages.[59]

This is the cornerstone of plaintiffs' argument in this case; since the FBI agents allegedly did not act in accordance with FBI policy, then injuries precipitated by negligent conduct should be actionable as outside the scope of a discretionary function. The Government contests this position strongly, and asserts that Agent O'Connor's acts and decisions are insulated from Tort Claims Act liability in either of two ways. First, it is argued that O'Connor's decisions were the implementation of a discretionary plan and therefore entitled to protection under *Dalehite*. This view requires a finding, which the Government strenuously urges, that O'Connor acted in accordance with prescribed FBI guidelines. Second, the Government asserts that the decision made, not the one making it, establishes the existence of immunity, and that any decision made by O'Connor relative to intervention is of the type to be insulated from judicial review. In this regard the Government would further have it that the Director of the FBI would have had the discretionary authority to modify FBI guidelines in this instance, and therefore O'Connor, as his on-the-scene delegate of decision-making responsibility, was cloaked with equal discretion in devising a course of action.

These arguments are persuasive, but the court feels they accord to the Government a breadth of immunity beyond that necessarily preserved in § 2680(a). Initially, the court finds from a review of all the evidence that Agent O'Connor pursued a course of conduct which sufficiently contravened FBI policy to preclude invocation of immunity for subordinates acting in accordance with official directions.[60] This finding would be dispositive of the Government's discretionary function defense if the FBI policy under consideration in this case clearly amounted to a plan or program of government which prescribed specific actions and procedures for the many FBI field agents upon whom would fall the ultimate responsibility of apprehending hijackers. As the Government is quick to point out, however, this policy is not an inflexible set of operational guidelines, nor could it be expected to be in view of the many diverse factual situations with which FBI agents are confronted in pursuing such criminals. Indeed, as alluded to by the Government above, there is some question in the court's mind whether the policy guidelines in question can realistically be characterized as a discretionary plan of government for purposes of analysis under § 2680(a). This view then poses the further question of to what extent independent decisions made by FBI agents in the pursuit of criminals may form the basis of negligence suits against the United States under the Tort Claims Act.

The Government has made the argument that official delegates of executives possessing discretionary authority exercise discretionary decision-making when making decisions which, if made by the one delegating the authority,

---

59. *See, e. g.,* Eastern Air Lines v. Union Trust Company, *supra,* 221 F.2d at 77; Somerset Seafood Co. v. United States, 193 F.2d 631 (4th Cir. 1951); Sullivan v. United States, 129 F.Supp. 713, 714 (N.D.Ill.1955);

Dishman v. United States, 93 F.Supp. 567 (D.Md.1950).

60. This finding is covered more fully in the section on FBI policy and procedures on hijackings, under seal.

would have been protected. Taken to its ultimate conclusion, this proposition would effectively preempt from judicial review all but the most insignificant ministerial decisions. While the court agrees, in substance, that decisions should be analyzed quality-wise, not level-wise, it does not necessarily follow that a given decision is in all contexts "discretionary"; immunity reserved to the Government for the executive whose decision affects the welfare of many need not extend to the officer whose spontaneous reaction affects but a very few. While damage suits in the former instance might drastically affect the ability of the Government to govern, in the latter they should not.

■ In short, the court can see no reason why the Tort Claims Act should not be interpreted so as to create government liability for the negligence of federal law enforcement officers in the act of pursuing criminals.[61] This is not to suggest that police activity does not frequently involve the making of determinations requiring a high degree of judgment and discretion. Agent O'Connor, for example, was called upon to choose among several alternative courses of action within a short span of time, but the test for protected activity is not merely the existence of some decision-making responsibility in the officer whose conduct is being questioned. See, Smith v. United States, 375 F.2d 243, 246 (5th Cir. 1967). It has been held permissible for courts to review the conduct of an officer charged with negligently shooting a bystander to a crime;[62] no reason comes to mind why the same should not hold true when the negligence charged is inducing another to pull the trigger.

The court finds this holding consonant with the purposes of the Tort Claims Act and unobstructive of those valid policies served when the sovereign should be immune. In terms of the test for immunity previously stated, the court is of the opinion that injury resulting from the conduct of FBI agents acting on their own impulse or in nonconformity with a discretionary governmental policy can be subjected to judicial review without thereby jeopardizing the quality and efficiency of federal law enforcement programs. It has not been thought intolerable to efficient law enforcement to qualify the immunity of the individual officer charged with ignoring one's constitutional rights,[63] and for at least as compelling reasons it should not impair the effectiveness of federal law enforcers when those injured through their negligence may seek redress from the Government.

■ Insofar as individual officers are concerned, personal accountability for negligence could well be expected to have a deleterious effect upon an officer's willingness to act, and therefore compromise the effectiveness of law enforcement as a whole. Recognition of this possibility underlies the generally accepted rule that government officers are immune from liability for torts committed in the performance of discretionary activities within their scope of authority. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971); Norton v. McShane, 332 F.2d 855 (5th Cir. 1964). The principal purpose of this rule is to shield responsible government officers from the threat of damage suits "which might appreciably inhibit the fearless, vigorous and effective administration of policies of government." Barr v. Matteo, supra, 360 U.S. at 571, 79 S.Ct. at 1339. The Government contends that the FBI agents involved in this case would be entitled to officer immunity, and that consequently the United States is likewise immune under the Tort Claims Act's doctrine of respondeat su-

---

61. See, Sullivan v. United States, supra; Cerri v. United States, 80 F.Supp. 831 (N.D. Cal.1948).

62. Cerri v. United States, supra.

63. See, e. g., Jones v. Perrigan, 459 F.2d 81 (6th Cir. 1972); Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 456 F.2d 1339 (2d Cir. 1972).

perior. In the posture of this case, it is unnecessary to decide the extent to which FBI agents perform discretionary activity and are thus protected by immunity, for even if they would be, it does not follow that the United States is also immune under the Tort Claims Act. In fact, the court feels that a desirable relationship of sovereign and officer immunity compels an opposite result.

The Tort Claims Act is silent on the question of whether employee immunity poses a bar to suit against the United States, but there is at least one indication within the Act which militates against this interpretation. The effect of § 2679(b), (c) is to establish Government liability for an immune employee's tort by making suit against the United States the exclusive remedy for damages resulting from an employee's act or omission while driving a motor vehicle within the scope of his employment. Related to this is the rule that the United States may not seek indemnity from an employee whose negligence in the operation of an automobile has resulted in Government liability. United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898 (1954).

There are other reasons why the Government's position in this regard appears untenable. Initially, the application of immunity sought by the Government would largely emasculate the purpose of the Tort Claims Act; it would be inconsistent with the Act's waiver of immunity for the Government to reclaim immunity merely because no action could be brought against the employee whose act or omission gave rise to a damage claim. Moreover, since official immunity ordinarily exists only where the officer was acting within the scope of his employment, and since under the Act the Government may be liable only where the employee acted within the scope of his authority, 28 U.S.C. § 1346(b), it would seem inescapable that the Act con-templates Government liability in instances where an employee could not be sued. Furthermore, the fundamental reasons for the two immunities differ; for the officer it is to encourage unrestrained execution of responsibility, while for the sovereign it is to prevent judicial scrutiny of basic policies formulated by coordinate branches of government. To insulate the Government from liability for the inevitable mishaps which will occur when its employees perform their functions without fear of liability not only is unjust, but also serves no purpose for which sovereign immunity need exist. Further, given the general trend favoring growth of officer immunity, a rule which makes the United States immune as well would, in time, largely emasculate the remedial purposes of the Tort Claims Act. Certainly such a proposal runs counter to the generally accepted philosophy that sovereign immunity is a doctrine of decreasing application.

■ The Government's proposition also involves what the court views as an erroneous interpretation of the Tort Claims Act's doctrine of respondeat superior. The Act does not predicate Government liability upon whether the employee too may be liable, and the scheme of vicarious liability obtains from provisions of the Act which make the United States liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, the United States, as employer, is liable as a private employer under state laws of respondeat superior, and as a general rule, agents of private employers are not immune from tort liability.[64] In light of the Act's waiver of Government immunity for employee wrongs, it is somewhat incongruous to infuse into state laws of

---

64. Even where the agent is immune, the principal ordinarily has no defense because of this fact. Restatement (Second), Agency, § 217 (b).

employer liability concepts of immunity unique to the sovereign.[65]

Brooks v. United States, 152 F.Supp. 535 (S.D.N.Y.1957), is the only case cited by the Government specifically holding that vicarious liability cannot attach to the United States under the Tort Claims Act for tortious conduct of employees protected by officer immunity.[66] For reasons previously stated, the court finds this aspect of *Brooks* not only unsound but also uncalled for by any provision of the Act itself. No persuasive authority has been found to suggest that Government liability under the Tort Claims Act lies only where the action could have been maintained against the employee whose conduct resulted in the claim, and especially where an employee is charged with negligence in the performance of his duties, strong policy considerations favor making the Government and not the agent liable for damages. The public benefits when officers are able to pursue their duties without the inhibiting fear of personal liability, and damage claims for accidents can be spread among the entire population when the Government is held liable.

## NEGLIGENCE

The evidence adduced by plaintiffs is directed to showing that the FBI was negligent in (1) refusing to comply with the pilot's requests and to heed his warnings, and (2) forcibly disabling the aircraft by gunfire. Plaintiffs contend that the agent's actions in the above regard violated the standard of care required of both a reasonable man under like circumstances as well as that prescribed by the Government for FBI agents under those exact circumstances. Consideration will be given at this point to the principles of common law negligence involved, but matters relating to the FBI policy on hijackings, which are subject to the protective order in effect in this case, shall be treated in a separate portion of the opinion under seal.

Our society imposes a duty upon individuals to conduct their affairs in a manner which will avoid subjecting others to an unreasonably great risk of harm. An actor whose conduct creates a danger recognizable as such by a reasonable person in like circumstances will be held accountable to others injured as a proximate result of his conduct who have not contributed to their own harm. These general principles are well-known concepts in the law of negligence and are embodied in the Restatement of Torts, Second, which finds general application in Florida as in most other states.

Initially, the court accepts without citation that police officers are obligated, or have a duty, to exercise reasonable care in the performance of their official duties. More specifically, this means that actions taken by officers in apprehending criminals must not create an unreasonable risk of injury or death to innocent persons. To recover in this case plaintiffs must therefore show that Agent James O'Connor's decisions, upon which liability is sought to be predicated, exposed their decedents to a risk of harm which was unreasonable under the circumstances and which could have been expected to and did come to pass. The risk must have been an appreciable one at the time and under the existing circumstances, and it is not enough that in retrospect O'Connor's conduct can be viewed as unreasonable in light of subsequent events. The law, as set forth in the Restatement (Second), Torts § 289, requires O'Connor to have recognized that his conduct involved an unreasonable risk of harm to innocent persons aboard the hijacked aircraft if a reason-

65. In the instant case, Florida courts have discarded as anachronistic the doctrine that municipalities are immune from liability for wrongful acts committed by employees in the exercise of governmental functions. Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957).

66. For an opposing view of Government liability under the Tort Claims Act, *see* United States v. Hull, 195 F.2d 64 (1st Cir. 1952); Meyer Mfg. Co. v. Foley, 234 F.Supp. 732 (S.D.Iowa 1964).

able man would have done so while exercising (a) such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have; and (b) such superior attention, perception, memory, knowledge, intelligence and judgment as the actor himself has.[67] Thus, the standard in this case is of a reasonable FBI agent. In addition, however, the law is uniform that sudden emergency is a factor to be considered in judging the character of an actor's conduct, but the extent an actor will be excused for errors in judgment under such circumstances is qualified by training and experience he may have, or be expected to have, in coping with the danger or emergency with which he is confronted.[68] Therefore, the characterization of a hijacking as an emergency has a more limited application when assessing the conduct of an FBI agent than it would in viewing the actions of a private individual.

Agent O'Connor had knowledge of several basic facts relative to this hijacking prior to the time 58 November taxied to a stop in front of Air Kaman. He knew that two armed men claiming to possess explosives had abducted a woman and forcibly boarded a small aircraft in Nashville, Tennessee, and were proceeding on a hijacked flight, ostensibly to Freeport, Bahamas. The woman was the wife of one of the hijackers, and she and her husband were reported to have had a history of marital difficulty. The pilot was stopping in Jacksonville to obtain fuel and several other items which he had been led to believe he could expect, and he had specifically asked that no one be permitted to come near the airplane. With this much known, O'Connor made his first decision: the aircraft would not be allowed to refuel. In his own words, O'Connor intended at that point to play a "waiting game" with the avowed purpose of obtaining time in which to reason with the hijacker. At this point no attempt was made to block the aircraft's route of escape, but O'Connor clearly never entertained the possibility of granting the pilot's request for fuel.

In the approximately fifteen-minute interval between the time the aircraft parked at Air Kaman and the time of his decision to effect armed intervention, O'Connor learned several more facts which, along with his analysis of the situation, prompted his decision to disable the aircraft. First, he was advised by Agent Burns in the tower that the pilot reported having only a 30-minute fuel supply left, and that the hijacker was monitoring radio communications. Then, after speaking briefly with Crump and Wallace as each exited the aircraft to negotiate for fuel, O'Connor learned that the hijacker appeared to be mentally disturbed and had been drinking, was considerably agitated over being refused fuel, the woman was occasionally hysterical, neither Crump nor Wallace desired to reboard the plane, and that Giffe might force Downs to take off without refueling.

The total sequence of events, particularly the hijacker's willingness to permit first the co-pilot and then an apparent accomplice to leave the aircraft, convinced O'Connor that this was a most "unusual" hijacking. His principal concern was apparently that the hijacker would force the pilot to depart with what O'Connor believed to be a fuel supply of only thirty minutes.[69] He considered this a dangerous possibility, and given the "unusual" situation O'Connor concluded that the hijacker would give up his remaining hostages and surrender if escape was impossible.

There were several other pertinent facts about this hijacking which

---

67. *See* Spivey v. Battaglia, 258 So.2d 815 (Fla.1972); Florida East Coast R. Co. v. Peters, 77 Fla. 411, 83 So. 559 (1920); *cf.*, Smith v. Hinkley, 98 Fla. 132, 123 So. 564 (1929).

68. *See* Cook v. Lewis K. Liggett Co., 127 Fla. 369, 173 So. 159 (1937).

69. In actuality, the aircraft had approximately 90 minutes worth of fuel remaining.

O'Connor was not aware of in making his decisions on the morning of October 4, 1971. Most important was descriptive information about the hijacker, George Giffe. The most complete source of such data was not available to O'Connor; information gathered in Nashville that Giffe generally carried a firearm, that he had delusions about belonging to the Mafia, and his description as a psychopathic liar and neurotic with whom the FBI should be cautious apparently did not reach Jacksonville. The FBI's failure to get this information to Jacksonville prior to the hijacked aircraft's arrival forms another part of the plaintiffs' charges of negligence. Specifically, plaintiffs contend that a reasonable person in Myers' position would have telephoned the Jacksonville FBI office to relay directly his information on Giffe rather than speaking only with agents in the Memphis regional headquarters. However, the court will not reach the question of negligence in this regard, and holds that Myers was entitled to follow regularly established FBI routes of communication. While it was unfortunate that O'Connor did not have this information available, it is certainly open to dispute whether knowledge of these factors would necessarily affect a decision reached without them.

Plaintiffs have argued that O'Connor made too little effort to solicit from Crump and Wallace a more complete description of Giffe.[70] The court agrees that available information of this nature would be earnestly sought by a law enforcement officer reasonably contemplating a test of George Giffe's determination. However, the importance of asking whether O'Connor sought relevant and available information lies not in present reflections on what did occur, but in determining whether he reasonably apprised himself then of what might occur. The question goes to foreseeability of risk, and an actor will be charged

with knowledge of those things he should reasonably have considered.[71] Nevertheless, on the basis of information he did have, O'Connor quite obviously perceived that his decisions, both to deny fuel and to forcibly intervene, entailed an element of risk to the hijacker's hostages. The creation of risk is not, of itself, negligence; but the law does require a reasonable assessment of harm's likelihood, and regards as negligent any act which creates a risk of such magnitude as to outweigh the utility of the act itself. See Restatement (Second), Torts § 291. cf., Spivey v. Battaglia, supra.

Therefore, deciding whether O'Connor's actions were reasonable requires a balancing of the threatened harm and the utility of his conduct. The balance involves consideration of such factors as the social value of the interests threatened, the probability and extent of harm to those interests, the social value of what is sought to be achieved through the actor's conduct, and the chance that this interest will be best served by the conduct in question as opposed to any other less dangerous alternative course of conduct which could have been pursued. Society obviously places a great value on human life, and a reasonable man in O'Connor's position could not have helped but see that a substantial probability of harm to plaintiffs' decedents accompanied almost any decision to terminate the hijacking against the hijacker's will. At the same time, society attaches great value to effective law enforcement, and in this light any decision permitting a criminal to escape capture is not easily countenanced. It would also have been reasonable to conclude, as O'Connor apparently did, that permitting departure was not certain to aid the hostages' perilous situation.

Agent O'Connor was therefore confronted at the Jacksonville airport by a

---

70. The court concludes that O'Connor was justified in not speaking at length with Wallace, then a suspected co-hijacker, by virtue

of FBI policy of not interrogating a suspect under those circumstances.

71. See, Restatement (Second) Torts § 289.

criminal who challenged him to act so as to protect two significant interests: hostage safety and apprehension of their captor. Plaintiffs have approached this problem as one in which the acts to serve each interest are mutually exclusive; in other words, a decision to capture the hijacker would be the one most dangerous to his hostages. The court cannot agree that this would necessarily follow in a reasonable man's assessment of the situation.

■ Despite O'Connor's acknowledged emphasis with George Giffe's capture, the court finds that his decisions to deny fuel and to disable the aircraft were within the realm of possible alternatives which might have reasonably been taken by one who considered passenger safety the paramount concern. The alternative to terminating the hijacking was permitting the hijacker to depart; either choice involved risks of unknown magnitude. The hypothetical "reasonable" law enforcement officer in O'Connor's position might well have concluded, as he did, that the risks created by permitting the continued flight of a hijacker who had been drinking and who supposedly possessed an explosive device were at least as great, if not greater, than those risks attendant to an immediate confrontation on the ground. The decision to effect active intervention before the aircraft could depart is supported by several features of this hijacking, some of which were mentioned by O'Connor as influential in his thinking.

First, there was the matter of Giffe's permitting Crump and Wallace to deplane for fuel. While in some respects this was not unusual or unexpected, it could be taken as reflective that the hijacker was not overly resolute nor inclined towards irrational behavior. It would obviously make some impression on an objective observer that after being told that the co-pilot would not return to the aircraft, a co-hijacker himself would proceed to come out.

Second, the demeanor of the debarking co-pilot and passenger was significant; Crump was apparently visibly shaken by the incident, and neither he nor Wallace desired to reboard the aircraft. This factor could reasonably prompt either alternative decision mentioned above, but it does not seem without logic that a law enforcement officer would hesitate to permit the departure of an aircraft to which these two were so fearful to return. While the remaining hostages were not yet secure, perhaps they too did not relish the prospects of a continued flight into the unknown.

Third, there existed the possibilities of what the hijacker might decide to do once airborne again. If the pilot were to be shot, but only wounded, certainly his chances for survival were better on the ground than in the air. While the possibility of the hijacker shooting the pilot while airborne might seem remote, it nevertheless would be relevant to deciding whether to risk its occurrence. Then too, deserving of consideration in this incident was the chance of others elsewhere being killed or injured should the alleged bomb explode and the aircraft crash.[72]

Another fear voiced by O'Connor was that Giffe would force Downs to take off, the limited fuel be consumed, and the aircraft crash either on land or somewhere at sea. Plaintiffs respond that the simple solution would have been to permit the requested refueling. This would have remedied one concern, but not others; it would have permitted escape where other factors reasonably indicated that capture was no more dangerous. In reference to all of O'Connor's concerns, plaintiffs point to the uneventful two-hour flight from Nashville as being reasonable assurance

72. O'Connor's remark that the existence of a bomb was "malarkey" would indicate that the possibility of an explosion did not enter into his thinking. On the other hand, his calling a bomb squad to open the metal box supposedly containing the device would indicate otherwise.

that no untoward events should be expected on the next leg of the flight. This factor, while worthy of consideration, need not have impelled a decision to permit refueling and departure. The decision had to be a product of several considerations and, given the interests advanceable by capture, the rationality of Giffe's behavior for the past two hours might also give rise to a reasonable hope that he would not react irrationally if made to surrender.

In conclusion, the court finds that O'Connor's challenged decisions were not an unreasonable response under all the circumstances. In traditional negligence terms, O'Connor was under a duty to choose a course of action which would maximize the hostages' safety, and to attempt a capture of the hijacker only if possible by means compatible with the greater interest. While the FBI obviously cannot undertake to guarantee the safety of persons in this situation, the means employed to effect any capture should be consonant with that which would provide the maximum assurance possible that hostages would not be harmed as a result. This duty was breached unless there reasonably appeared a better-suited alternative to protecting the hostages' well-being. To the court it seems obvious that the proper decision in this situation is a matter on which reasonable minds could differ; but viewed objectively and without the benefit of hindsight, the court is unable to conclude that the alternatives chosen by Agent O'Connor were unreasonable.

 Plaintiffs Downs and Lakich also contend that the United States is liable on a theory of negligence per se, alleging that the failure of Agent O'Connor to act in accordance with FBI directives or "policy" amounts to the violation of a statute, ordinance or administrative regulation specifically designed to protect the class of individuals of which their decedents were members. Although the court has found that O'Connor's actions did not strictly comply with FBI guidelines, it is not therefore true that the Government is liable on a theory of strict liability. First, the doctrine of negligence per se applies generally to a person's failure to comply with a standard of care set forth in a statute or regulation. Since neither of these is involved in this case, the doctrine is inapplicable. At most, an agent's violation of FBI guidelines creates a rebuttable presumption of negligence for non-compliance with an administrative rule. More importantly, it has been held that the United States is not subject to strict liability of any sort under the Tort Claims Act. See, Dalehite v. United States, supra; Laird v. Nelms, 406 U.S. 797, 803, 92 S.Ct. 1899, 32 L. Ed.2d 499 (1972).

As a predicate for the court's findings on damages, there remain for brief disposition the issues of proximate causation and contributory negligence.

 A great deal of the evidence presented by both sides was directed towards proving or disproving a causal relationship between the FBI's acts of armed intervention and the deaths of Brent Downs and Susan Giffe. The Government advanced the theory that Giffe killed Downs before the FBI's first shot had been fired, and therefore the armed intervention, even if negligent, was not a direct cause of the hostages' deaths. This theory is built primarily on Agent McBride's deposition testimony that he heard two "muffled" shots just after receiving O'Connor's instruction to block the aircraft. In response, plaintiffs assert that Downs was alive until the shooting of the right engine, and in support of this position offered evidence to show that he had attempted to shut down the engine after it was shot.[73] A number of hypotheses as

---

73. Due to the noise of the engine and his distance from the aircraft, plaintiffs contend that the shots heard by McBride must have been those fired by Murphy.

to the sequence of gunshots and deaths may be drawn from the evidence.[74] However, the court does not find it necessary to determine the precise time at which George Giffe killed his wife and the pilot, and would conclude that the total sequence of events, beginning with the denial of fuel and continuing through the various acts of FBI gunfire, coalesced to produce the deaths of Brent Downs and Susan Giffe.

The court would further have found the absence of any act or omission on the part of Downs or other BBAI employees and officers amounting to contributory negligence. The Government has charged that Downs contributed to his own fate by, among other things, disregarding various FAA regulations (in ways such as taking off in Nashville without tower approval and serving alcoholic beverages on board the aircraft), misleading the hijacker as to the amount of fuel remaining, failing to grab Wallace's gun, and, in particular, by failing to take off from Jacksonville prior to the time his route of escape was blocked. To merely mention these allegations seems sufficient to establish their derisive groundlessness, and, in contrast to the Government's implications, the court views the degree of composure retained by Brent Downs in safely conducting this flight under most trying conditions as reflective of his overall proficiency as a pilot.

The court would likewise find no foundation for the Government's allegations of negligence on the part of BBAI personnel for failing to anticipate Giffe's intentions and take preventative measures, or in the failure of BBAI officers to instruct its pilots and ground employees in applicable hijack procedures and related matters. Given these findings, plaintiffs' recoveries would not be barred or diminished, and no basis would exist for the Government's third party complaint against Mrs. Downs and BBAI.

## THE BBAI CLAIM

The BBAI suit, which is based on the theory of trespass to chattels, seeks to impose liability on the Government for damage intentionally inflicted to a privately-owned aircraft by FBI agents acting to prevent the escape of a felon. The Government apparently reasserts in this instance the discretionary function exception of § 2680(a) and, in addition, asserts that a portion of the damages claimed by BBAI are barred by the interference with contract rights exception of § 2680(h). As in the Downs and Lakich actions, the court holds that the discretionary function exception is inapplicable in the circumstances of this case. While the court finds § 2680(h) also inapplicable, this aspect of the BBAI action need not be discussed since the court finds that the case must be dismissed on more fundamental grounds.

Although trespass is not a tort exempted from Tort Claims Act coverage in § 2680, the court holds that BBAI is not entitled to recover since the FBI agents were privileged to act as they did in committing what would otherwise have been an actionable trespass. The general rule in this regard is expressed in the Restatement (Second), Torts § 265:

"One is privileged to commit an act which would otherwise be a trespass to a chattel or a conversion if he is acting in discharge of a duty or authority created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority." *See also*, comments d and e to § 265; Giacona v. United States, 257 F.2d 450 (5th Cir. 1958); 52 Am.Jur., Trespass, § 41.

The above-stated rule would appear to preclude recovery in the BBAI case if damaging the aircraft was reasonably necessary in the exercise of the FBI's

---

74. Giffe fired a total of 8 shots: 2 through the windshield, 2 into Downs, 3 into his wife, and 1 into himself. In attempting to recon-struct the shooting sequence, the only fact beyond speculation is that Giffe's final victim was himself.

authority in apprehending a criminal. In deciding whether disabling the aircraft was reasonable under the circumstances, the BBAI case must be segregated from the accompanying negligence actions, and the situation treated as though Giffe had been attempting to escape alone in the BBAI aircraft.[75] Viewed in this way, the court finds that disabling by gunfire the aircraft which Giffe would have utilized for his escape was certainly a reasonable means to effect his capture. Therefore, finding that the FBI was authorized to act and did act in a reasonable way to prevent Giffe's escape, the court holds that the BBAI suit must be dismissed.

The privilege in this instance is invokable on behalf of federal agents incident to the exercise of their authority as law enforcement officers. Nevertheless, the court's ruling in this case is not based solely on the fact that the BBAI cause of action arose out of the performance by federal employees of a purely governmental function of apprehending criminals. The question here is not one of immunity for torts occurring in the performance of governmental activity, but rather whether actionable conduct in fact occurred. The Tort Claims Act waived sovereign immunity for the tortious performance of even governmental functions, but did not waive defenses other than immunity, such as privilege, otherwise available to the Government as well as to private individuals.

In a sense, it is difficult to resolve the BBAI case in terms of the United States being treated as a private person for purposes of liability since private individuals do not have the duty or normally the authority of a police officer in these circumstances. Nevertheless, the duty and authority cannot be ignored for they are the factors which give rise to a privilege to act in ways which might otherwise be tortious. In addition, it might be pointed out that the privilege spoken of here, i.e., damaging the chattel of a third person to prevent a felon's escape, is one which might be asserted by a private defendant under proper circumstances. The court has found no Florida cases on this precise issue, but Florida does apply the analogous common law privilege of private persons to arrest a known or suspected felon in certain situations without a warrant. Moll v. United States, 413 F.2d 1233 (5th Cir. 1969); Marden v. State, 203 So.2d 638 (Fla.App.1967); Collins v. State, 143 So.2d 700 (Fla.App.1962); see also, Restatement (Second), Torts § 119. This privilege should include not only making an arrest, but also acts, such as intermeddling with another's chattel, reasonably necessary to prevent the felon's escape. See, Restatement (Second), Torts §§ 204–206, and § 265, comment d.

As a further point, the court does not consider that the acts of Government agents in disabling 58 November constituted a "taking" of property within the meaning of the Fifth Amendment. The Just Compensation Clause has been said to be ". . . understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power." Omnia Commercial Co. v. United States, 261 U.S. 502, 510, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923). Cf., Armstrong v. United States, 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); Finks v. United States, 395 F.2d 999, 1004, 184 Ct.Cl. 480 (1968). The court finds useful in this case a test for compensable property appropriations in riot control situations found in National Board of YMCA v. United States, 395 U.S. 85, 94, 95, 89 S.Ct. 1511, 1517, 23 L.Ed.2d 117 (1969) (concurring opinion), in which it was stated: ". . . the Just Compensation Clause may only be properly invoked when the military had reason to believe that its action placed the property in question in greater peril than if *no* form of protection had been provided at all." Damage to

---

75. Whether the shooting amounts to actionable negligence in the Downs and Lakich cases has no bearing whatsoever in deciding whether such acts constitute actionable trespass.

the hijacked aircraft was not only incidental to lawful police activity, but also, for reasons analogous to those presented in the discussion on negligence, the FBI agents had substantial reason to believe that their acts would result in less aircraft damage than if no action had been taken at all.

### RIGHT TO PUBLIC TRIAL

On December 26, 1972, the court ordered that all documents and materials pertaining to hijacking signals and related FBI procedures should not be publicly disseminated and would therefore be made available to plaintiffs and introduced into evidence under seal. Plaintiffs, citing Rules 43(a) and 77(b), Fed.R.Civ.P., contend that the protective order thereby denies them the right to a public trial. Since in most respects this case did receive a public trial in open court, the more limited question is whether Rules 43(a) and 77(b) require that plaintiffs should have been allowed to elicit testimony from witnesses in open court as to the content of materials which, in the public interest, were disclosed by the FBI only pursuant to the provisions of a protective order.

The issue is not as broad as the analogous question of whether these materials were discoverable under Rule 26, Fed.R.Civ.P., for plaintiffs were afforded the desired information and, subject to the requirement of non-disclosure, were able to make use of the protected materials in preparing for trial. Certainly, therefore, plaintiffs were not in any way hindered in proving their cases. Even under Rule 26, however, it is well recognized that the Government has a right to protect information which, if released, might be harmful to the public interest. *See,* United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); Black v. Sheraton Corporation of America, 50 F.R.D. 130 (D.D.C. 1970); City of Burlington, Vermont v. Westinghouse Electric Corp., 246 F. Supp. 839 (D.D.C.1965).

While plaintiffs advocate the public interest in the open dissemination of evidence introduced in judicial proceedings, there is to be balanced against this the countervailing public interest in preserving the secrecy of policies and procedures which, if publicized, might compromise the FBI's effectiveness in apprehending hijackers and significantly jeopardize the safety of the passengers and crew of hijacked aircraft. In the court's opinion, this latter interest clearly outweighs the former, and this is particularly true where the information involved has been fully disclosed to plaintiffs for use in preparation of their case. The court therefore holds that the protective order was properly utilized in these proceedings and did not offend the principles underlying the public trial requirement.

The above memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P. in Civil No. 6642. Related subject matter cases Nos. 6322 and 6348, having been effectively disposed of by various orders previously entered, shall be dismissed. An appropriate order shall be entered.